No. 97-048

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 18

IN RE THE MATTER OF J.M.W.E.H.,
A YOUTH IN NEED OF CARE.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard Dzivi, Great Falls, Montana (appellant); Bethany Schendel, Great
Falls, Montana (youth)

For Respondent:

Joseph P. Mazurek, Attorney General, Christina Lechner Goe, Assistant
Attorney General, Helena, Montana; Brant Light, Cascade County
Attorney, Susan Weber, Kirsten LaCroix, Deputy Cascade County Attorneys,
Great Falls, Montana

Submitted on Briefs: September 9, 1997

Decided: February 4, 1998
Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 Terry E. (Appellant) is the natural mother of J.M.W.E.H. (J.H.), a minor child. She appeals from an order of the Eighth Judicial District Court, Cascade County, terminating her parental rights over J.H. and awarding permanent custody of J.H. to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err when it found that Appellant did not comply with the provisions of her treatment plan?

¶4 2. Did the District Court err when it refused to admit into evidence certain papers concerning Appellant's attendance to Alcoholics Anonymous (AA) meetings?

BACKGROUND
¶5 Appellant is the mother of five sons. J.H., born April 3, 1993, is the youngest of Appellant's children, and has a father different than that of his four older brothers. Appellant has been involved with the DPHHS regarding physical neglect of her children since 1984. In September, 1991, the DPHHS filed a petition for temporary investigative authority. During the period of investigation, Appellant was diagnosed as chemically dependant and began attending AA meetings. Appellant's case was closed in April, 1992, when she completed her treatment plan. After the close of the case, Appellant did not continue her AA meetings as recommended in her aftercare plan.

¶6 In March, 1993, the DPHHS received referrals regarding Appellant's neglect of her children. To prevent removal of the children, the DPHHS attempted several informal interventions. Appellant responded when the DPHHS intervened, but once the DPHHS closed the investigation, Appellant slipped back into her old patterns of behavior. This

same sequence of events happened again in October, 1993, just after J.H. was born.

¶7 Marie Spurzem (Spurzem) babysat J.H. from the time he was five months old until he was eleven months old. Spurzem stated that J.H. often arrived at her house in the morning dirty, cold, and hungry. Spurzem described one incident as follows:
I've never seen a dirtier child. [Appellant] brought him to me one day, and he had been sitting evidently in the swing for a long time. And I moved the swing, which is a chair that she brought him in, and there was urine in the chair that poured out on my foot on the floor. The baby was wet from the neck down. And it was chilly out. It was cold. The baby had a blanket over it but was not wrapped in the blanket. It was just sitting in this puddle.
Spurzem stated that Appellant often gave her chunky food unsuitable for a child of J.H.'s age, and that J.H.'s bottles often contained sour milk.

¶8 On January 28, 1994, after receiving several referrals from professional health care workers indicating a severely deteriorated situation, two social workers went to Appellant's home. The social workers found the children at home alone, with the two older twin boys, age 14, babysitting the three younger boys. The social workers took pictures of the home showing dog feces on the floor, garbage, moldy food, filthy kitchen counters and appliances, fire hazards, and the floor covered with dirty laundry. Nine-month old J.H. was sitting on the floor sucking on an ink pen. J.H.'s diaper was soiled and did not appear to have been changed all day.

¶9 While social workers were at the home, Appellant's sister, Jody Thompson, arrived and agreed to take the children to her home. Around this same time, Appellant called from the home of J.H.'s father, Michael H. The social workers informed Appellant that the DPHHS was taking custody of her children and that a civil action would be filed. Appellant informed Michael H. of the action, and the social workers called the father of the other children, James E., and informed him of the action.

¶10 On January 31, 1994, the DPHHS filed a petition for temporary legal custody and attached an affidavit explaining the above circumstances. On February 1, 1994, the court declared the five children as youths in need of care, and on February 18, 1994, after an adjudicatory hearing, the court issued an order granting temporary legal custody of the five children to the DPHHS for six months. The DPHHS placed the children with Appellant's sister and brother-in-law, Jody and Bert Thompson (Thompsons), for the period of temporary custody. The court attached to its order approved treatment plans for Appellant, Michael H., and James E. Among the objectives in Appellant's treatment plan was that she

was to (1) obtain a psychological evaluation and follow the examiner's recommendations; (2) attend regular AA meetings; (3) attend parenting classes; and (4) insure that her home was clean and hazard free. In July, 1994, the DPHHS returned the four older boys to Appellant's care. In August, 1994, the court held a review hearing in which the parties stipulated to a three-month extension of Appellant's treatment plan and temporary legal custody to the DPHHS. In September, 1994, the DPHHS returned J.H. to Appellant's care and continued monitoring the situation.

¶11 On October 24, 1994, the social worker assigned to the case, Brennan Swanberg (Swanberg), visited Appellant's home and found the home to be extremely unsanitary and dangerous for children. Swanberg saw dirty clothes and old food on the floor. Also on the floor were small objects such as pennies and wood chips which posed a great danger to J.H. Swanberg saw boards with exposed nails over the windows of the home and believed this posed a great danger to all the children.

¶12 On October 30, 1994, the Cascade County Sheriff's Office received a report that Appellant was waving a gun around in her home and posing a risk to her children. When Officer Steve Brekke arrived at the home, he noted that the Thompsons were in the house with Appellant, that Appellant was under the influence of something, but that the gun was boltless and was not loaded.

¶13 On November 29, 1994, the court held a review hearing. Based on Swanberg's and Officer Brekke's testimony, and Appellant's admission that she drank alcohol on October 30, 1994, the court placed all the children back in the care of the Thompsons, and extended Appellant's treatment plan and the DPHHS's temporary custody for another three months. On February 23, 1995, Hebe Chestnutt (Chestnutt) was appointed guardian ad litem for the five children. Meanwhile, James E. had moved to Nevada and expressed his interest in taking custody of the four older boys.

¶14 Another review hearing was held in March of 1995. The court was informed that James E. had found suitable living quarters for himself and the four older boys in Nevada. The DPHHS and Appellant stipulated to another three-month extension of the DPHHS's temporary custody of J.H. Appellant's treatment plan was modified, requiring Appellant to do the following: (1) complete a chemical dependency outpatient treatment program; (2) maintain sobriety; and (3) maintain a clean household. The court stated that after eight weeks, if Appellant complied with her treatment program, and if Appellant's chemical dependency counselor agreed, the court would allow Appellant to have overnight

unsupervised visits with J.H. in Appellant's home.

¶15 The review hearing set for May, 1995, was continued due to unavailability of counsel. On July 25, 1995, after a review hearing, the court issued an order extending temporary legal custody to the DPHHS for another three months. The court also restricted Appellant's visits with J.H. from unsupervised to supervised, and directed Appellant and Michael H. to make every effort to complete their treatment plans. Michael H. refused to complete his treatment plan and expressly stated that he did not wish to parent J.H. The DPHHS continued to monitor the situation.

¶16 On September 16, 1995, a neighborhood acquaintance of Appellant, Patricia Hopkins (Hopkins), saw Appellant at a local rodeo carrying cups of what appeared to be beer. Hopkins saw Appellant pass her three times in the stands, each time leaving empty-handed and returning with a new frothy beverage. Hopkins reported that she saw Appellant walking with Michael H. at the end of the rodeo.

¶17 At a review hearing on October 26, 1995, the parties again stipulated to another three-month extension of the DPHHS's temporary custody of J.H. The parties also stipulated to a modification of Appellant's treatment plan whereby Appellant would: (1) have no contact with Michael H. for the extension period; (2) attend AA meetings at least twice weekly; (3) maintain sobriety; (4) participate in random urinalysis testing; and (5) obtain counseling for problem-solving, self-esteem enhancement, and other issues the counselor deemed appropriate. The parties agreed that during the first month of the extension period, Appellant would have supervised visits with J.H., and that if Appellant complied with her treatment plan, she could have unsupervised visits with J.H. during the second month, and have J.H. returned to her care for the third month. The court issued an order containing the above provisions on October 30, 1995.

¶18 During the next three months, several people witnessed Appellant violating the terms of her treatment plan. The following incidents suggest that Appellant did not maintain sobriety and did not refrain from seeing Michael H. On October 27, 1995, one day after Appellant agreed to her modified treatment plan, Swanberg saw Appellant in a bar. When Appellant saw Swanberg, Appellant fled but Swanberg could not catch her. On November 17, 1995, Chestnutt saw Appellant leaving Michael H.'s house at 7:30 a.m. When Appellant saw Chestnutt, she again fled. On December 15, 1995, Chestnutt saw a woman in Michael H.'s trailer. Appellant's car was not at the trailer, so Chestnutt drove to Appellant's residence. Appellant's car was there, but the hood was up and the car did not appear to be operational. The next day, Chestnutt saw Michael H.'s truck parked at Pampered Pets

Salon, Appellant's dog-grooming business. Later the next week, on two separate occasions, Chestnutt drove by Michael H.'s trailer and saw Appellant's car there. Bert Thompson, Appellant's brother-in-law and J.H.'s foster parent, also saw Appellant's car parked at Michael H.'s trailer in December, 1995, on "several occasions."

¶19 Regarding Appellant's urinalysis testing, Swanberg stated that Appellant would not answer the phone and would not make herself available for testing. With regard to the court-ordered counseling, Appellant admitted she did not seek counseling. Regarding Appellant's visitation with J.H., Appellant had five supervised visits with J.H. during the entire three-month extension period. Chestnutt reported that during these visits, J.H. did not appear to be bonded to Appellant, and seemed disturbed in visits with her, often saying "No, Terry, No Terry." Chestnutt reported that J.H. called his foster mother, Jody Thompson, "Mommy." The DPHHS did not allow Appellant to progress to unsupervised visits with J. H., due to reports that she had violated her treatment plan.

¶20 On February 1, 1996, the DPHHS filed with the court a petition for termination of Appellant's parental rights over J.H., and the court set an initial hearing date for March 5, 1996. The hearing commenced March 5-6, 1996, but due to illness of Appellant's counsel, was not completed until September 16, 1996.

¶21 During the six-month period from the commencement to the conclusion of the hearings, the DPHHS continued to note incidents when it appeared Appellant was violating her treatment plan. In March, 1996, Chestnutt saw Appellant leaving a bar, and in June, 1996, Chestnutt saw Michael H.'s truck parked at Pampered Pets Salon at 7:30 a.m. In September, 1996, Swanberg was informed that R.E., Appellant's ten year old son, was living with his mother. Swanberg called R.E.'s school but was informed that R.E. was not enrolled in school. Swanberg and Chestnutt then went to Appellant's apartment to find R.E. Swanberg and Chestnutt noted that the television was on, but no one answered the door. The door was open, so Swanberg and Chestnutt entered and called for R.E. While in Appellant's apartment, Swanberg saw two empty beer cans in the kitchen and one half-empty beer can on Appellant's nightstand. Appellant's business partners also reported that during the summer of 1996, Appellant and her older sons were living at Pampered Pets Salon, and that conditions in the shop were so unclean that customers complained and took their business elsewhere. Bert Thompson stated that since initiation of the termination action in January, 1996, Appellant had not requested any visits with J.H., even on his birthday.

¶22 During the last two hearings, September 11 and 16, Appellant testified on her own behalf to explain to the court why her parental rights should not be terminated. Regarding her drinking, Appellant denied drinking any alcohol since October, 1994. She claimed that the witnesses who had seen her in bars or seen her carrying cups of beer at the rodeo were either mistaken or lying. She explained that the empty beer cans found in her apartment in September, 1996, belonged to her landlady and landlady's boyfriend who were helping her move.

¶23 Regarding her contact with Michael H., Appellant admitted having contact with him, but denied "intimate contact." She testified that Michael H. came to her residence only to fix her car and help her move. She admitted that during some of these visits, while her sons were visiting, Michael H. had contact with her sons. Appellant stated that her car was at Michael H.'s trailer only to be fixed, and that she herself was never at Michael H.'s trailer.

¶24 Regarding her attendance at AA meetings, Appellant testified that she attended AA meetings twice weekly from October 1995 through February 1996; that in other months she attended AA only two or three times monthly; and that in May, 1996, she stopped going to AA meetings altogether because she was too busy with her business and her older children who were visiting for the summer. Appellant attempted to admit her AA attendance slips into evidence, but the DPHHS objected on grounds of hearsay and lack of foundation. The court sustained the objection and refused to allow the slips into evidence.

¶25 When asked why she never obtained the court-ordered counseling for problem-solving and self-esteem enhancement, Appellant stated that Swanberg was supposed to make the appointment and that she never heard from Swanberg. When asked why she never requested visitation with J.H. since January, 1996, Appellant replied that she thought her visitation rights had been taken away when the petition for termination was filed.

¶26 On October 8, 1996, the District Court entered its Findings of Fact, Conclusions of Law, and Order terminating Appellant's parental rights over J.H. and awarding permanent legal custody of J.H. to the DPHHS. Specifically, the court found that: (1) Appellant had not successfully completed her treatment plan; (2) the conduct or condition of Appellant rendering her unfit was unlikely to change within a reasonable time; and (3) termination of Appellant's parental rights over J.H. was in J.H.'s best interests.

## STANDARD OF REVIEW

¶27 The standard of review of a district court's findings of fact in a parental rights termination case is whether the findings are clearly erroneous. Matter of J.L. (1996), 277 Mont. 284, 287, 922 P.2d 459, 461. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the District Court made a mistake. Matter of R.B.O. (1996), 277 Mont. 272, 277, 921 P.2d 268, 271 (citation omitted). With the exception of a district court's conclusions involving the exercise of discretion, such as a determination that a child is abused or neglected, we review a district court's conclusions of law to determine whether they are correct. Matter of R.B.O., 921 P.2d at 271. The standard of review for evidentiary rulings is whether the District Court abused its discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

DISCUSSION

¶28 In deciding whether to terminate one's parental rights, a court must make findings in accordance with the criteria set out in § 41-3-609, MCA. Matter of C.A.R. (1984), 214 Mont. 174, 182-83, 693 P.2d 1214, 1219. Section 41-3-609, MCA, provides in pertinent part:

Criteria for termination. (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.

Section 41-3-609(1), MCA. Section 41-3-609(2), MCA, further provides:

In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and

emotional needs of the child within a reasonable time;

. . . .

(d) excessive use of intoxicating liquor . . . that affects the parent's ability to care and provide for the child;

. . . ; and

(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

¶29 Because the termination of parental rights involves fundamental liberty interests, the party seeking termination must present to the district court clear and convincing evidence that the above statutory criteria have been met. Matter of J.L., 922 P.2d at 461. Moreover, when evaluating the above criteria, the court must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs. Section 41-3-609(3), MCA; Matter of J.L., 922 P.2d at 461.

Issue 1

¶30 Did the District Court err when it found that Appellant did not comply with the provisions of her treatment plan?

¶31 Appellant makes several arguments to support her contention that the District Court erred in finding she failed to comply with the provisions of her treatment plan. First, Appellant argues that the court's finding was based on unproven assumptions and hearsay, rather than on clear and convincing evidence. Second, Appellant argues that the court improperly considered "old, irrelevant" evidence of Appellant's conduct prior to October 30, 1995, the date the court issued its last modified treatment plan. Third, Appellant argues that she complied with the provision of her treatment plan requiring that she not maintain contact with Michael H., because she refrained from "intimate" contact with him. Finally, Appellant argues that the court erred in considering evidence gathered by Swanberg when she entered Appellant's home without permission. We will address each argument separately.

A. Credibility of Witnesses

¶32 First, Appellant argues that there exists no credible evidence on which to base a finding that Appellant failed to comply with her treatment plan. Appellant contends that the statements made by several witnesses indicating they had seen Appellant's car at Michael

H.'s trailer, and had seen Michael H.'s truck at Appellant's home and place of business, are not conclusive proof that Appellant and Michael H. were actually in contact with each other. Similarly, Appellant contends that the statements made by several witnesses indicating they had seen Appellant in a bar, had seen beer cans in her apartment, and had seen her carrying cups of a frothy beverage at the rodeo, are not conclusive proof that Appellant was drinking. Appellant points out that on cross-examination, Swanberg and Chestnutt stated they never saw the physical bodies of Appellant and Michael H. together, only their vehicles. Appellant also highlights Hopkins' statement on cross-examination that the frothy beverages could possibly have been soft drinks. Finally, Appellant points to her own contradictory testimony as proof that the witnesses' allegations are unsubstantiated.

¶33 In the context of parental rights termination cases, we have defined the term "clear and convincing evidence" as that quality of proof "more than a mere preponderance but not beyond a reasonable doubt." Matter of J.L., 922 P.2d at 462 (adopting the Kansas Supreme Court's holding in In the Interest of S.M.Q. (1990), 247 Kan. 231, 796 P.2d 543, 545). We have held that clear and convincing evidence "does not call for unanswerable or conclusive evidence." Matter of J.L., 922 P.2d at 462 (citation omitted).

¶34 Applying these rules to the instant case, the fact that Appellant's testimony conflicts with other witness testimony, or the fact that the witnesses' allegations are based on inferences, does not automatically preclude the court from finding that Appellant violated her treatment plan. The evidence in the record is substantial and establishes beyond a mere preponderance that Appellant violated her treatment plan. Moreover, in non-jury trials, the credibility of witnesses and the weight to be afforded their testimony is a matter left to the sound discretion of the district court. Keebler v. Harding (1991), 247 Mont. 518, 523, 807 P.2d 1354, 1357. It is not the role of this Court to "substitute [our] evaluation of the evidence for that of the trial court, or pass upon the credibility of witnesses." Matter of J.L., 922 P.2d at 462 (citation omitted).

¶35 Appellant points out that the District Court allowed into evidence hearsay testimony by Burt Thompson concerning what Appellant's eldest twin son told him about Appellant's unclean house. While we agree with Appellant that this testimony is inadmissible hearsay under Rule 801(d), M.R.Evid., we hold the admission of the testimony to be harmless error. We have held that "a reversal cannot be predicated upon an error in admission of evidence, where the evidence in question was not of such a character to have affected the result." Matter of Inquiry into M.M. (1995), 274 Mont. 166, 169, 906 P.2d 675, 677. Given the extensive evidence presented by the DPHHS against Appellant, much of which is set out in the beginning of this opinion, the exclusion of the hearsay statement would not have made

a difference in the final outcome of this case. Having extensively reviewed the record, we hold that the District Court's findings are supported by substantial evidence and are not clearly erroneous.

B. Relevant Time Period for Evaluation

¶36 Appellant next argues that in deciding whether Appellant complied with her treatment plan, the court erred in considering evidence of Appellant's behavior occurring prior to October 30, 1995, the date of Appellant's last modified treatment plan. Without legal analysis, Appellant summarily argues that the incidents occurring before October 30, 1995, are "irrelevant." It appears Appellant bases her argument on language in the court's October 30, 1995 order wherein the parties stipulated:

1. That [Appellant] has substantially complied with the treatment plan approved by this Court on January 12, 1995.

¶37 The DPHHS counters that when making the decision to terminate parental rights, the district court is entitled to consider the entire history of the case. Matter of K.F.L. (1996), 275 Mont. 102, 106, 910 P.2d 241, 244 ("[A] complete history is relevant" to the issue of parental rights termination); Matter of Inquiry into B.T.B. (1992), 254 Mont. 449, 453, 840 P.2d 558, 559-60 (court did not abuse its discretion in considering parents' non-compliance with prior treatment plans).

¶38 We agree with the DPHHS and hold that the District Court did not err in considering evidence of Appellant's non-compliance with treatment plans in effect prior to October 30, 1995. Although the parties stipulated that Appellant substantially complied with the January 12, 1995 treatment plan, this stipulation is not logically inconsistent with the court's ultimate decision to terminate Appellant's parental rights. The court considered the entire history of Appellant's case and found that Appellant was unsuccessful in completing her overall treatment plan. Based on our review of the record, we conclude that this finding was not clearly erroneous.

C. The Meaning of "Maintain Contact"

¶39 Appellant next argues that she complied with the provision of the treatment plan requiring that she not maintain contact with Michael H. because she refrained from "intimate" contact with Michael H. Appellant blames the court for failing to specify the meaning of "maintain contact," and argues that her interpretation of the provision, that she could still be friends but could not have intimate contact with Michael H., is the correct one. Appellant argues that any other interpretation would be "ludicrous" as it would mean

that even a coincidental meeting with Michael H., such as passing by one another while walking down the street, would be a violation of the treatment plan.

¶40 We do not agree with Appellant. First, we note that the court did not impose the above provision on the parties. Rather, the court adopted the provision as stipulated by the parties. Appellant agreed to not maintain contact with Michael H. for ninety days. If Appellant thought the provision to be ambiguous at that time, she should not have stipulated to it. Second, had the court intended that Appellant refrain only from intimate contact with Michael H., the court would have inserted the word "intimate" in its order. The meaning of the provision was clear and unambiguous. No contact means no contact, either intimate or casual. We conclude that the court's finding that Appellant violated her treatment plan by maintaining contact with Michael H. was not clearly erroneous.

D. Alleged Illegal Entry of Appellant's Home

¶41 Finally, Appellant assigns error to the District Court's consideration of evidence illegally obtained by Swanberg when she entered Appellant's home without permission and while no one was home. Appellant argues that this evidence should have been excluded as fruit of an illegal search and seizure. Appellant reasons that had this evidence been excluded, the District Court's findings would have been clearly erroneous for lack of substantial evidence supporting the findings.

¶42 We decline to address the search and seizure issue on the merits. This issue is not properly before us because it was not raised in the District Court. The Montana Rules of Evidence provide:

Error may not be predicated upon a ruling which admits . . . evidence unless . . . a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context.

Rule 103(a)(1) M.R.Evid.

¶43 During the termination hearings, Swanberg was examined and cross-examined concerning the circumstances surrounding her September, 1996 entry into Appellant's apartment, and the beer cans she saw while inside the apartment. Appellant never objected to the testimony and the District Court was never presented with the opportunity to rule on its admissibility. Therefore, we cannot consider the issue on appeal.

¶44 In sum, we conclude that the District Court's findings are supported by substantial evidence and, therefore, are not clearly erroneous. The record is replete with evidence that Appellant did not successfully complete her treatment plan. She continued to see Michael H., she failed to maintain sobriety, she failed to attend AA meetings on a regular, consistent basis, and she failed to obtain individual counseling. The court correctly found that Appellant's conduct rendering her unfit was unlikely to change within a reasonable time. The court considered the fact that since the DPHHS obtained temporary custody of her children in February, 1994, Appellant was given numerous continuances and opportunities to comply with her treatment plan. The court correctly found that termination of Appellant's parental rights was in the best interests of J.H. J.H. had been out of the care of his mother for all but the first 10 months of his life. The record shows that Appellant neglected caring for J.H. for those few months, and that thereafter J.H. was not bonded to his mother. Based on these circumstances and the record as a whole, we hold that the District Court's findings concerning termination of Appellant's parental rights were not clearly erroneous.

Issue 2

¶45 Did the District Court err when it refused to admit into evidence certain papers concerning Appellant's attendance to AA meetings?

¶46 During the September 11, 1996 hearing, Appellant attempted to admit into evidence documentation of her recent attendance to AA meetings. The DPHHS objected on the grounds of hearsay and lack of foundation, and the court sustained the objection. Appellant argues the court erred in refusing to admit the AA slips at the September 11, 1996 hearing, when it had already admitted a similar AA slip at a prior March 5, 1996 hearing. Appellant further contends that her testimony met the requirements of authentication as provided in Rule 901(a) and (b), M.R.Evid.

¶47 The court was not required to admit into evidence Appellant's AA slips at the September 11, 1996 hearing simply because it had admitted a similar slip at a prior hearing. At the March 5, 1996 hearing, the DPHHS failed to object to the admission of the AA slip, therefore it was admitted. However, at the September 11, 1996 hearing, the DPHHS properly objected to the slips and the court properly sustained the objection.

¶48 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), M.R.Evid. A statement is "(1) an oral or written assertion or (2) nonverbal conduct of a

person, if it is intended by the person as an assertion." Rule 801(a), M.R.Evid. Here, the AA slips are clearly hearsay as they are written assertions made by leaders of AA meetings, and offered by Appellant as proof of her attendance to AA meetings. Appellant neither alleges nor establishes that any hearsay exception or exclusion applies to admission of the AA slips. We conclude that the court did not abuse its discretion in ruling that Appellant's AA slips were inadmissible. Because we conclude that Appellant's AA slips were properly refused as inadmissible hearsay, we need not consider the issue of authentication.

¶49 Accordingly, the District Court's decision to terminate Appellant's parental rights over J.H. is affirmed.

/S/ WILLIAM E. HUNT, SR.


We Concur:

/S/ J. A. TURNAGE
/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON