DA 13-0539

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 79

IN THE MATTER OF:

J.S.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DN 01-05
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Elizabeth Thomas, Attorney at Law; Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Katie F. Schulz, Assistant
Attorney General; Helena, Montana

          Mitchell Young, Lake County Attorney; Polson, Montana

          Emily Von Jentzen, Assistant Attorney General; Kalispell, Montana

                  Submitted on Briefs:  February 5, 2014
                        Decided:  March 25, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     S.F. appeals the decision of the Twentieth Judicial District Court, Lake County, to award guardianship of his minor son, J.S., to foster parents. Because J.S. is an "Indian child," as defined in 25 U.S.C. § 1903(4),[1] the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq., applies. We affirm the District Court and restate S.F.'s issues on appeal as follows:

¶2     *1. Did the State violate ICWA by failing to provide proper notice to S.F. and his tribe?*

¶3     *2. Did the State violate ICWA by failing to make active efforts to provide services and promote the relationship between S.F. and J.S.?*

¶4     *3. Did the State violate ICWA by failing to provide proper expert testimony for establishing guardianship and the continued placement of J.S. outside S.F.'s care?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     J.S.'s father, S.F., is an enrolled member of the Curyung Tribe, located in Dillingham, Alaska. J.S.'s biological mother, B.S., is an enrolled member of the Confederated Salish and Kootenai Tribes. J.S. was born in 1998 and is currently an enrolled member of the Curyung Tribe (J.S. enrolled on June 11, 2008). In 2001, the State removed J.S. from B.S.'s care, in Ronan. At that time, J.S.'s father was unknown. In February 2002, J.S. was adjudicated a youth in need of care, and temporary legal

---

[1] The term "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

custody was granted to the Department of Public Health and Human Services (the Department). B.S. eventually named S.F. as the putative father, and on September 9, 2002, S.F. was personally served with notice of the Department's petition to extend its temporary legal custody over J.S. S.F. did not appear at the hearing, and his default was entered. The District Court granted a motion to intervene by the Confederated Salish and Kootenai Tribes on February 7, 2003.

¶6 In March 2003, B.S.'s parental rights were terminated. The Department made several attempts to conclusively identify J.S.'s father, but it was not until September 2004 that a paternity test confirmed that S.F. was J.S.'s biological father. On March 22, 2006, the Department facilitated contact between S.F. and J.S. On May 31, 2006, the Department placed J.S. in foster care with D.Y. and S.Y. (the foster family), along with other of J.S.'s siblings. The foster family had previously adopted two of J.S.'s siblings.

¶7 On August 21, 2006, the Department filed a petition to terminate S.F.'s parental rights, alleging that he had failed to establish a relationship with J.S. or prove that he intended to care for him. S.F. was personally served with notice of the termination hearing, but there is no evidence that the Curyung Tribe ever received notice. S.F. appeared at the hearing and obtained counsel. The District Court extended the hearing three times to allow S.F. to complete a treatment plan. In October 2006, the Department filed a motion to dismiss its petition to terminate S.F.'s parental rights.

¶8 In December 2007, the Department again moved to terminate S.F.'s parental rights due to his failure to maintain contact with the Department. S.F. was served, and notice

3

was sent to the Curyung Tribe of the termination proceedings. On February 14, 2008, the court granted the Curyung Tribe's motion to intervene. S.F. moved to dismiss the petition, arguing that the Department had failed to comply with ICWA. The Department stipulated to dismissal and agreed to create a treatment plan for S.F. Subsequently, the Department developed several treatment plans for S.F., but the Department believed that S.F. was not demonstrating an interest in completing them, and none were court approved.

¶9 On March 15, 2011, the Department filed a Motion for Hearing to Address Treatment Plan. The Curyung Tribe received notice of the hearing by certified mail. During the hearing, the Department sought to obtain court approval of a treatment plan. S.F. objected and stated that he would not work certain components of the plan because "he could teach the classes that they want him to attend." The court approved a treatment plan.

¶10 On November 16, 2011, the Department filed another motion to terminate S.F.'s parental rights. The child protection specialist's report to the court indicated that S.F. had made no effort to visit with J.S., was unwilling to complete the treatment plan, and had made representations through counsel that he wished to relinquish his rights. The court denied the Department's termination request during an April 12, 2012 hearing because the Department had failed to call an ICWA expert familiar with the customs and culture of the Curyung Tribe. Instead, the court extended temporary legal custody over J.S. for three months and ordered that the treatment plan be revised to include specific dates for

4

the completion of tasks. The court also directed the Department to make active efforts to assist S.F. in completing the plan. The Department then attempted to facilitate communication between S.F. and J.S. by suggesting that S.F. write a letter to J.S. and call him.

¶11 On July 3, 2012, the Department filed a Notice of Filing indicating that S.F. had completed many aspects of his treatment plan, but failed to follow through on several others. On July 19, 2012, the court held a permanency plan hearing. J.S., then fourteen years old, indicated to the court that he wished to remain with his siblings and the foster family, where he had been living for the past six years. The court approved a permanency plan in the alternative—reunification with S.F. or guardianship with the foster family. On July 30, 2012, the Department filed a petition requesting an additional six months for S.F. to complete his treatment plan. In August 2012, S.F. and J.S. met with their attorneys present, and then attended two counseling sessions during the fall of 2012.

¶12 On November 14, 2012, the Department filed a Petition for Legal Guardianship. S.F. objected and petitioned to transfer jurisdiction to the Curyung Tribe. On December 13, 2012, the court sent notice by certified mail to the Curyung Tribe. A transfer hearing was held, wherein tribal representatives testified that the Curyung Tribe did not wish to accept jurisdiction and supported granting guardianship of J.S. to the foster family. The court denied S.F.'s transfer request and conducted a guardianship hearing on March 14, 2013. Testimony was received from Nikki Grossberg (Grossberg),

Regional Administrator for the Department, and Chris Itumulria (Itumulria), a Tribal Children's Service Worker for the Curyung Tribe. Grossberg testified that J.S. had consistently expressed a desire to remain with the foster family. Itumulria testified as an ICWA expert, over the objection of S.F., that the Curyung Tribe supported guardianship. Itumulria noted that J.S. had been "in the system for 11 years" and opined that removing him from foster care "at this time would do some serious emotional harm."

¶13 On July 26, 2013, the court issued its Findings of Fact and Conclusions of Law and Decree of Guardianship. The court ultimately determined to grant guardianship over J.S. to the foster family. S.F. appeals.

## STANDARD OF REVIEW

¶14 We review a district court's findings of fact to determine if they are clearly erroneous. *In re J.W.C.*, 2011 MT 312, ¶ 15, 363 Mont. 85, 265 P.3d 1265. Findings of fact are clearly erroneous if they are not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with the definite and firm conviction that a mistake has been committed. *In re G.S.*, 2002 MT 245, ¶ 24, 312 Mont. 108, 59 P.3d 1063. We review a district court's conclusions of law for correctness. *In re M.P.M.*, 1999 MT 78, ¶ 12, 294 Mont. 87, 976 P.2d 988. "'A district court's application of the law to the facts of a case is a legal conclusion which we review to determine whether the interpretation of the law is correct.'" *In re J.W.C.*, ¶ 15 (quoting *In re C.H.*, 2000 MT 64, ¶ 9, 299 Mont. 62, 997 P.2d 776).

**DISCUSSION**

¶15 Under Montana law, a guardian may be appointed for a child who has been placed in the custody of the Department during a child abuse or neglect proceeding. Section 41-3-444(1), MCA. Such guardianships are authorized upon the court's findings that:

> (a) the department has given its written consent to the appointment of the guardian, whether the guardianship is to be subsidized or not;
> (b) if the guardianship is to be subsidized, the department has given its written consent after the department has considered initiating or continuing financial subsidies pursuant to subsection (9);
> (c) the child has been adjudicated a youth in need of care;
> (d) the department has made reasonable efforts to reunite the parent and child, further efforts to reunite the parent and child by the department would likely be unproductive, and reunification of the parent and child would be contrary to the best interests of the child;
> (e) the child has lived with the potential guardian in a family setting and the potential guardian is committed to providing a long-term relationship with the child;
> (f) it is in the best interests of the child to remain or be placed with the potential guardian;
> (g) either termination of parental rights to the child is not in the child's best interests or parental rights to the child have been terminated, but adoption is not in the child's best interests; and
> (h) if the child concerning whom the petition for guardianship has been filed is an Indian child, as defined in the Indian Child Welfare Act, 25 U.S.C. 1901, et seq., the child's tribe has received notification from the state of the initiation of the proceedings.

Section 41-3-444(2), MCA. S.F. does not argue that the District Court's award of guardianship to the foster family violated state law. Rather, S.F. focuses on federal law, contending that the Department's failure to comply with ICWA "tainted the entire proceedings."

7

¶16 ICWA establishes the "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes . . . ." 25 U.S.C. § 1902. Congress designed ICWA "primarily to counteract the unwarranted *removal* of Indian children from Indian families." *Adoptive Couple v. Baby Girl*, 570 U.S. ___, 133 S. Ct. 2552, 2555 (2013) (citation omitted) (emphasis in original). To that end,

> [a]ny Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of . . . this Act.

25 U.S.C. § 1914. While ICWA requires state courts to follow "'strict procedures'" and "'meet stringent requirements,'" *In re K.B.*, 2013 MT 133, ¶ 21, 370 Mont. 254, 301 P.3d 836 (citation omitted), it "does not provide for invalidation of a valid separate action because of an invalid prior one," *In re M.E.M.*, 209 Mont. 192, 196, 679 P.2d 1241, 1243 (1984) (determining that alleged violations of ICWA during the temporary custody proceedings did not invalidate the properly conducted permanent custody proceedings); *see also D.E.D. v. State*, 704 P.2d 774, 782 (Alaska 1985) (concluding that "even if the procedural and jurisdictional defects asserted by [the appellant] existed in the earlier temporary custody hearings, they were cured by the subsequent procedurally correct final dispositional hearing.").

¶17    *1. Did the State violate ICWA by failing to provide proper notice to S.F. and his tribe?*

¶18    25 U.S.C. § 1912(a) provides as follows regarding notice:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child *shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.* If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

(Emphasis added.)   ICWA, therefore, requires that notice be provided to both the "parent" and the "Indian child's tribe." The "parent" means "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." 25 U.S.C. § 1903(9). The "Indian child's tribe" means "(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts." 25 U.S.C. § 1903(5).

¶19    S.F. argues that "[a]lthough the State did provide notice to [S.F.], the notice did not comply with the ICWA" because it did not contain information about "his right to

9

intervene, to contest the proceedings, to have counsel or the application of the ICWA." Moreover, according to S.F., both he and the Curyung Tribe should have received notice "upon the establishment of paternity in September 2004[,] . . . upon petition for appointment of a surrogate parent in 2005, upon placement of J.S. in a new, non-ICWA compliant foster home in May 2006, upon filing of the August 2006 petition to terminate parental rights, and upon filing of the November 2007 petition to terminate [S.F.'s] parental rights." The State's failure to provide adequate notice, he alleges, "adversely affected the Curyung Tribe's ability to participate, advocate and protect the rights of [S.F.] as a tribal member."

¶20 The State responds that S.F. was not initially considered a "parent" under 25 U.S.C. § 1903(9) because paternity had not been established, but even so, he received "personal notice of the proceeding in 2002." After S.F. was identified as J.S.'s biological father in 2004, "only two permanency plan hearings took place without S.F. being notified." According to the State, "any deficiencies in providing notice to S.F. during the temporary custody proceedings were later cured by subsequent notifications." The State points to the fact that from August 2006 forward, S.F. and his counsel received proper notice of all proceedings, including the final guardianship hearing, which S.F. did not attend. Likewise, the State maintains that the Curyung Tribe "was properly served for all proceedings from 2008 onward," and any delay "prior to the final dispositional petition is not justification for invalidating the final guardianship hearing." We agree with the State's argument.

¶21 With regard to S.F., although the State failed to provide notice between the establishment of paternity in September 2004 and the August 2006 termination proceeding, S.F. received personal notice of the State's petition for temporary legal custody in September 2002. At that point, S.F. was merely a putative father and not entitled to notice under 25 U.S.C. § 1903(9). Nonetheless, S.F. was served, and he failed to appear at the hearing. The record also indicates that S.F. received notice of each of the State's petitions to terminate his parental rights between 2006 and 2011. He likewise received notice of, and actively participated in, the permanency plan and treatment plan proceedings between 2009 and 2012. Finally, and importantly, S.F. received notice of the guardianship hearing, but once again failed to appear. While S.F. is correct that 25 U.S.C. § 1912(a) requires notice of the right to intervene, he fails to cite any authority supporting his position that the State was required to provide information about his right to contest the proceedings, his right to counsel, or the application of ICWA. In any event, S.F.'s argument on this point is unavailing because he did intervene, was represented by counsel throughout these proceedings, and raised his ICWA concerns on several occasions.

¶22 The Curyung Tribe received notice of the State's petition to terminate S.F.'s parental rights in December 2007 and formally intervened in February 2008. The record establishes that the Curyung Tribe continued to receive notice of all subsequent proceedings and actively participated in this case. During the guardianship hearing, tribal

representative Itumulria testified that "[t]he tribal court formed an opinion to go along with the guardianship with the [foster family]."

¶23 As noted above, we generally will not overturn valid proceedings based on invalid prior proceedings. *In re M.E.M.*, 209 Mont. at 195-96, 679 P.2d at 1243. We conclude that the State's failure to provide notice at the outset of these proceedings does not provide a basis to overturn the District Court's ultimate guardianship order. Both S.F. and the Curyung Tribe participated extensively in this case, and S.F. was afforded numerous opportunities to complete a treatment plan, but failed to do so. Any initial shortcomings on the part of the State were subsequently cured, satisfying the notice requirements of ICWA at the time of the guardianship hearing.

¶24 *2. Did the State violate ICWA by failing to make active efforts to provide services and promote the relationship between S.F. and J.S.?*

¶25 ICWA provides that:

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (hereinafter, § 1912(d)). While § 1912(d) does not set forth detailed criteria for determining whether "active efforts" have been made, a "[c]ommon sense construction of the meaning of 'active efforts' requires only that 'timely affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designated to remedy problems which might lead to severance of the parent-child relationship.'" *In re G.S.*, ¶ 36 (citation

12

omitted).  Under this standard, the State must do more than simply "give[] the parent a treatment plan and wait[] for him to complete it"—rather, § 1912(d) "implies heightened responsibility."  *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556.  However, "a parent's demonstrated apathy and indifference to participating in treatment" may be considered by a district court in determining whether the State has made "active efforts." *In re A.N.*, ¶ 23 (citation omitted).  So too, a court may consider actions taken by the State to provide services for the other parent and the child.  *In re D.S.B.*, 2013 MT 112, ¶ 17, 370 Mont. 37, 300 P.3d 702.

¶26    S.F. claims that from the time he was identified as J.S.'s putative father in 2002, through April 2012, the State failed to satisfy its duty to make "active efforts."  S.F. explains that "more than five (5) years passed between the establishment of paternity and the time that the State moved the district court to adopt a treatment plan."  He argues that after the Court ordered the treatment plan, the State did not assist him in completing it, and cites the following statements of the District Court during the termination hearing on April 12, 2012:

> So the issue that remains is did the State do what they had agreed to on the parenting plan so that they actually handled their responsibilities especially under ICWA.  And it appears to the Court based on the testimony that they did not.
>
> .  .  .
>
> I think the problem I've got, though, based on the testimony, unless there's testimony from the State with regard to the active involvement of the child protective specialist.  I mean, based on the testimony of the State's expert in that area she indicated that she did not in fact do any of those things. That makes it very difficult for the Court to find that.

13

S.F. maintains that efforts made by the State later in the process did not erase the State's "decade long failure to comply with the active efforts requirement."

¶27 The State responds that the Department provided services specific to S.F., but S.F. "failed to avail himself of those services and showed little or no interest in parenting J.S." The State notes that it created three informal treatment plans for S.F. between 2006 and 2012, and set up "family counseling, encourag[ed] letter writing, and connect[ed] the foster family with S.F. to further open up communication opportunities." The State points out that S.F. made clear that he did not intend to participate in parenting education, advised the court that he wished to relinquish his parental rights, failed to maintain consistent contact with the Department, and communicated minimally with J.S. Finally, the State argues that we must consider its efforts to provide services for B.S., J.S., and his siblings—"[t]he Department made active efforts with the mother (provided treatment plans, visits, consulted with the CSKT, *etc.*) and placed the children with approval of the children's tribes throughout these proceedings." Alternatively, the State draws our attention to the United States Supreme Court's recent holding in *Baby Girl*, which the District Court also discussed at length.

¶28 While the State made efforts to connect S.F. with J.S.—specifically, following the April 2012 termination proceeding—we conclude that the holding in *Baby Girl* is dispositive. In *Baby Girl*, Biological Father and Birth Mother[2] separated after Birth Mother became pregnant with Baby Girl, an Indian child. Via text message, Birth

---

[2] These identifying terms were used in *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2558.

14

Mother asked Biological Father if he would rather pay child support or relinquish his parental rights. Biological Father responded that he would relinquish his parental rights. Birth Mother then decided to give Baby Girl up through adoption. Birth Mother selected a non-Indian adoptive couple, who supported her emotionally and financially throughout her pregnancy and were present at the time of the child's birth. Biological Father failed to provide financial assistance to Birth Mother during her pregnancy and in the months following Baby Girl's birth. He also "'made no meaningful attempts to assume his responsibility of parenthood' during this period." *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2558. In the subsequent adoption proceedings, Biological Father refused to consent to the adoption and sought custody of Baby Girl. Following trial, the South Carolina Family Court awarded custody of Baby Girl to Biological father, even though she was 27 months old and had never met him. The South Carolina Supreme Court affirmed, holding that the adoptive couple had not shown that "'active efforts ha[d] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family'" pursuant to § 1912(d). *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2559.

¶29 On appeal, the United States Supreme Court reversed, concluding that § 1912(d) did not apply to Baby Girl's situation. The Court held that "§ 1912(d) applies only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights." *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2562. The Court defined "breakup" to mean "'[t]he discontinuance of a relationship'" or "'an ending as an

15

effective entity.'" *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2562 (citations omitted). Under this definition, "when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]'—and no 'effective entity' that would be 'end[ed]'—by the termination of the Indian parent's rights." In such circumstances, the "'breakup of the Indian family' has long since occurred, and § 1912(d) is inapplicable." *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2562.

¶30 The facts in *Baby Girl* are similar to those here. Like Biological Father, S.F. never obtained legal or physical custody of J.S. and did not initiate a relationship with J.S. until many years after his birth. The record indicates that the State first facilitated a visit between S.F. and J.S. on March 22, 2006, nearly two years after paternity had been established and over eight years after J.S. was born—a long delay that occurred despite the fact that S.F. acknowledged, "I was aware before [J.S.] was born [J.S.] was my son." After he made initial contact with J.S., S.F. refused to complete remedial parenting classes and indicated multiple times during multiple hearings that he wished to relinquish his parental rights. The District Court accurately described the relationship between S.F. and J.S. as "non-existen[t]," and recognized that the Department "cannot force the creation of a personal relationship between a Youth and his estranged father where none has previously existed."

¶31 Although *Baby Girl* dealt with termination of parental rights instead of a guardianship, § 1912(d), by its terms, applies equally in both instances. Where, as here,

16

the "'breakup of the Indian family' has long since occurred," we will not apply § 1912(d) to reverse an otherwise validly established guardianship. *See Baby Girl*, 570 U.S. at \_\_\_, 133 S. Ct. at 2562. As the United States Supreme Court noted, the explicit congressional purpose of ICWA is to provide "certain 'standards for the *removal* of Indian children from their families.'" *Baby Girl*, 570 U.S. at \_\_\_, 133 S. Ct. at 2563 (citations omitted) (emphasis in original). ICWA was never intended to "facilitate a *transfer* of the child *to* an Indian parent." *Baby Girl*, 570 U.S. at \_\_\_, 133 S. Ct. at 2563 (citing 44 Fed. Reg. 67584, 67592 (Nov. 26, 1979)) (emphasis in original). Given the non-existent relationship between S.F. and J.S., and their very limited personal contact throughout these proceedings, we conclude that § 1912(d) does not provide a basis to overturn the District Court's award of guardianship to the foster family based on the State's alleged failure to make "active efforts."

¶32 *3. Did the State violate ICWA by failing to provide proper expert testimony for establishing guardianship and the continued placement of J.S. outside S.F.'s care?*

¶33 ICWA requires testimony from a qualified expert in order to effect the foster care placement of a child:

> No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e) (hereinafter § 1912(e)). Although expert testimony is necessary, a court need not base its decision on expert testimony alone. *In re D.S.B.*, ¶ 18. A court may consider all of the evidence properly before it. *In re D.S.B.*, ¶ 19.

¶34 S.F. argues that the expert testimony presented at the guardianship hearing "falls short of the requirement set forth by the ICWA." He maintains that Itumulria merely referenced "the length of time that J.S. had been in the system in response to inquiry of potential emotional or physical harm. There was no testimony that identified any conduct or condition of the Father likely to cause emotional or physical harm." He cites *In re K.B.*, ¶ 28 for the proposition that "'failure to elicit expert testimony regarding whether continued custody will result in serious emotional or physical damage to the children requires reversal . . . .'"

¶35 The State responds that Itumulria was a qualified ICWA expert, with personal knowledge of the Curyung Tribe's customs and cultural standards, and over twenty years of experience. According to the State, the District Court properly considered Iumulria's testimony in conjunction with the testimony of others, the case record, and J.S.'s wishes when it concluded that "permitting S.F. to have custody of J.S. would likely result in serious emotional or physical injury to the child." Alternatively, the State again cites the District Court's discussion of *Baby Girl* and its determination that § 1912(e) does not apply in this case because S.F. never had custody of J.S.

¶36 In addition to addressing the "active efforts" requirement of § 1912(d), *Baby Girl* analyzed the "continued custody" provision in 25 U.S.C. § 1912(f) (hereinafter § 1912(f)). Similar to the wording in § 1912(e), cited above, § 1912(f) provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued

custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

The Supreme Court explained that § 1912(f) "conditions the involuntary termination of parental rights on a showing regarding the merits of '*continued* custody of the child by the parent.'" *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2560 (emphasis in original). Because the "adjective 'continued' plainly refers to a pre-existing state . . . [t]he phrase 'continued custody' [] refers to custody that a parent already has (or at least had at some point in the past)." *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2560. Given this construction, the Supreme Court held that "§ 1912(f) does not apply in cases where the Indian parent *never* had custody of the Indian child." *Baby Girl*, 570 U.S. at ___, 133 S. Ct. at 2560 (emphasis in original).

¶37 The similar provision of § 1912(e) conditions the placement of a child into foster care "on a showing regarding the merits of '*continued* custody.'" The only substantive difference between § 1912(f) and § 1912(e) is their respective standards of proof— § 1912(f) requires evidence beyond a reasonable doubt, while § 1912(e) requires clear and convincing evidence. As we have discussed above, the record in this case clearly establishes that S.F. never had custody of J.S. Indeed, the District Court found that S.F. "was not involved in the child's life for the significant part of 15 years and only became interested in the action ten years after significant State involvement refocused his attention to the matter." Because there is no custody to "continue," we conclude that § 1912(e) does not apply and does not serve to invalidate the District Court's award of guardianship.

19

¶38 Based on ample evidence in the record, we conclude that the District Court appropriately rejected S.F.'s legal arguments and properly determined that guardianship of J.S. by his foster family was appropriate.

¶39 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BETH BAKER