FILED

07/23/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0573

DA 23-0573

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 150N

IN THE MATTER OF

J.K.S.-L.,

Youth in Need of Care

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 22-237
Honorable Colette B. Davies, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kelli S. Sather, Appellate Defender, Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Katie F. Schulz,
Assistant Attorney General, Helena, Montana

Scott D. Twito, Yellowstone County Attorney, Leah Linger, Deputy
County Attorney, Billings, Montana

Submitted on Briefs:  June 5, 2024

Decided:  July 23, 2024

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Mother appeals the order entered in the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to J.K.S.-L. We affirm.

¶3 Mother has three children, C.L., J.L., and J.K.S.-L. Mother has had multiple interventions by the Department of Public Health and Human Services (Department) dating from 2016 when C.L. and J.L. were first removed following Mother's drug overdose that she suffered in their presence. Her youngest child, J.K.S.-L. was born in 2018 and an in-home safety plan was put into place to allow him to go home with Mother and his two half-siblings. In November of 2018, all three children were removed from Mother's care following an incident in which Mother's daughter had to be taken to the emergency room after passing out from using alcohol. As a result, Mother's two older children were placed with their father and Mother never regained custody of them. J.K.S.-L. could not go to his Father, who was incarcerated. Mother entered inpatient treatment and J.K.S.-L. was placed in foster care. Upon completion of treatment in June 2019, J.K.S.-L. was returned to Mother's care.

2

¶4     J.K.S.-L. was removed again in April of 2020 because of Mother's drug use. Father was incarcerated at the time, so J.K.S.-L. was again placed in foster care. After successfully completing inpatient treatment, J.K.S.-L. was placed back in Mother's care in August of 2021. In September of 2022, J.K.S.-L. was removed a third time following an anonymous report that Mother and Father were using illegal narcotics. The Department investigated the report and went to Mother's home on September 15, 2022. Father was the only adult home and, due to concerns for J.K.S.-L.'s safety, the Department asked if he would consent to a drug test, which Father agreed to do. While waiting for the drug test, Father informed the workers that he needed to leave to pick his other son up from school. The workers asked if he could call the school to let them know he would be a few minutes late and Father refused to make the call. Workers later learned that Father did not have custody of his other son. When the drug test arrived shortly thereafter, Father refused to take it. Father then handed J.K.S.-L. over to a worker and informed them he was leaving. As Father was leaving, J.K.S.-L.'s paternal Grandfather arrived. Father grabbed J.K.S.-L. from the worker and said J.K.S.-L. would instead be going with Grandfather. Law enforcement was called and when they arrived Grandfather left without taking J.K.S.-L. Mother was contacted and told to come home. Mother declined and J.K.S.-L. was again removed. Subsequently, J.K.S.-L.'s hair tested positive for amphetamines, methamphetamines, marijuana, and fentanyl. J.K.S.-L.'s methamphetamine levels were higher than 10,000, the highest level the test could display. Thus, J.K.S.-L. had an extremely high amount of methamphetamine in his system. J.K.S.-L. told workers that his

parents smoke and that it smells and makes him choke. He also said his parents "never" buckled him into his car seat.

¶5 Unlike the first two removals in which Mother was engaged and participated in treatment, her case worker testified Mother's "engagement [was] minimal up until the end of May of 2023" after J.K.S.-L.'s third removal. The Department scheduled an in-person visit with Mother and Father in September of 2022 which Mother's case worker described as having gone okay but that following the visit J.K.S.-L. became very emotional. After removing J.K.S.-L. the third time, CPS informed Mother that she had an appointment the following day at the office to discuss what had happened. Mother did not show for the appointment. Mother texted after the time set for the meeting and stated that she "couldn't emotionally get the nerve to come talk with [the Department]." A second appointment was made with Mother for the following Monday but Mother failed to appear for that appointment as well.

¶6 On September 21, 2022, the Department petitioned the court for emergency protective services (EPS), adjudication of J.K.S.-L. as a youth in need of care (YINC), and temporary legal custody (TLC). At an EPS hearing on September 27, 2022, neither Mother nor Father opposed EPS. When the court inquired whether the Indian Child Welfare Act (ICWA) applied, the following exchange occurred:

| | |
|---|---|
| Court: | Okay. So let me ask you each. [Mother,] do you have any reason to believe that [J.K.S.-L.] is an Indian child? |
| Mother: | He's not enough enrolled. I'm only three eighths and he's not enough. We tried. |
| Court: | Okay. And, [Father,] same question for you. |
| Father: | No. |

4

| Court: | I didn't hear you, sir.  Sorry. |
|---|---|
| Father: | I'm not. |
| Court: | You're not Indian?  Is that what you said? |
| Father: | Yeah, no. |

As a result, the court determined there was "no reason to know" J.K.S.-L. was an Indian child and that ICWA did not apply to the proceeding.  Nonetheless, the Fort Belknap Indian Community—Mother's Tribe—was contacted and on October 4, 2022, the Tribe sent a letter to the court advising that J.K.S.-L. was not enrolled nor eligible for enrollment with the Tribe.

¶7     On October 26, 2022, the Department petitioned the court for a determination that preservation/reunification efforts need not be provided, for termination of parental rights (TPR), and for the Department to be granted permanent legal custody.  A hearing was set for December 13, 2022.  In October of 2022, a visit was conducted over Zoom between Mother, Father, and J.K.S.-L., which J.K.S.-L.'s foster mother described as not having gone well because J.K.S.-L. would not engage and just cried.  It was also noted that during the visit both Mother and Father failed to ask questions related to J.K.S.-L.'s care, how he was doing, or whether he was happy.  An in-person visit was scheduled for November 7, 2022, and gas vouchers were provided to Mother and Father.  However, Mother texted 15 minutes after the visit was supposed to begin and advised they had never left Billings and were not going to come for the visit.  Mother stated she had car troubles and would not explain why she had not informed the Department of this issue earlier.

¶8     Mother requested another visit for the week of November 14, 2022.  However, J.K.S.-L. had to have nasal surgery and he was not recovering well so Mother was informed

5

her visit would have to be postponed. Mother did not request another visit until February or March of 2023. However, at that point she was not engaging in her treatment and was thus informed she needed to show some progress prior to having visitations resumed. Thereafter, Mother stopped requesting visitations. Father never requested a visitation following the visit he missed in November of 2022.

¶9 After removal from his parents the third time, J.K.S.-L. was placed with a foster family—with whom he had been placed before—and has been there ever since. J.K.S.- L.'s foster mother testified that when he first arrived J.S.K.-L. was in poor condition. She described that he had an odor, the source of which she could not determine. After seeing a doctor, J.S.K.-L. was referred for surgery and ultimately had his tonsils and adenoids removed. J.K.S.-L.'s foster mother testified that during this procedure, the surgeon found "meth paper up both sides of his nostrils, and that was apparently the smell that they never would have found if they had not done that surgery." However, she testified that although J.K.S.-L. struggled with the recovery, after the surgery he was "a whole different kid." He was eating better, had more energy, slept through the night, and was having fewer behavioral issues.

¶10 On December 13, 2022, Mother appeared with counsel at a combined hearing to determine whether reunification efforts were necessary and a termination of parental rights. The Department advised the court that an arraignment for Mother was scheduled for December 28, 2022, concerning charges of felony criminal endangerment by accountability and endangering the welfare of a child by accountability. The criminal

charges stemmed from J.K.S.-L.'s ingestion of narcotics. Following testimony from the Department and law enforcement, the District Court determined sufficient evidence existed to adjudicate J.K.S.-L. as a YINC and granted TLC to the Department. The TPR was continued for a later date. Additionally, the District Court again confirmed that ICWA was inapplicable:

> Court: All right. So, let me just also make this initial inquiry. Is there any reason to believe that this child is an Indian child?
> Mother: No.
> Mother's Counsel: You're not Native?
> Mother: I'm Native. I don't think [J.K.S.-L. is] enough.
> Court: Are you enrolled?
> Mother: Yes.
> Court: You're enrolled?
> Mother: Yes. [J.K.S.-L.] wasn't enrollable in the last cases.
> Court: Okay. And that's been established?
> Mother: Yes. He's not enrollable.

Mother was then asked whether there was any other tribe with which J.K.S.-L. could be enrolled. Mother replied "[w]ell, I'm not enrolled with my dad, but he's not on my birth certificate." This was the first time Grandfather's tribe was suggested as a possible option for J.K.S.-L. and the court instructed the Department to make sure ICWA was not applicable. The court then found by clear and convincing evidence that J.K.S.-L. had been abused or neglected or was at risk of being abused or neglected and adjudicated him as a YINC.

¶11 On January 23, 2023, the Department received a letter from Grandfather's tribe—Turtle Mountain Band of Chippewa—informing it that J.K.S.-L. was not currently a member and was not eligible for enrollment in the Tribe. At this point, both Mother and

7

Father had active warrants for their arrest and the Department was unable to locate them to notify them of a hearing set for February 7, 2023. The February 7 hearing was continued after Mother's counsel informed the court Mother would not appear because of her fear of being arrested. A new hearing date was set for April 4, 2023. Neil Friedel (Friedel)—the clinical director of Friedel Clinics responsible for conducting Mother's drug tests—later testified that during this time Mother continued to test positive for methamphetamine, amphetamine and Fentanyl.

¶12 On March 31, 2023, Mother was arrested. She was later transported to the courthouse to attend the April 4, 2023, hearing. However, Mother had been appointed new counsel who moved to continue the hearing to allow time to meet with Mother. The court granted the motion and continued the hearing until June 16, 2023. Mother posted bond on April 5, 2023, and was required to continue drug testing with Friedel for her criminal case. During a status hearing on May 16, 2023, the court was informed that once Mother posted bond, she immediately began testing positive for methamphetamine and amphetamine. The court also learned Mother had new charges for DUI and illegal drug possession.

¶13 The termination hearing set for June 2023 was continued because Mother's counsel was unavailable due to medical reasons. During the subsequent hearing on July 25, 2023, Friedel testified Mother had consistently tested positive for drugs since December of 2022. J.K.S.-L.'s foster mother testified that J.K.S.-L. was continuing to improve both physically and behaviorally. Additionally, the court heard testimony that Mother had refused attempts to get her to engage in services. During closing remarks, Mother's counsel challenged the

8

sufficiency of the court's prior determination that ICWA did not apply and maintained it would be in J.K.S.-L.'s best interest to remain with Mother provided she could remain sober.

¶14     On August 31, 2023, the District Court issued an order finding that ICWA did not apply because J.K.S.-L. was not enrolled or eligible for enrollment in either Mother's or Grandfather's tribes.  On September 1, 2023, the District Court entered an order that reunification efforts were not required and terminated Mother's parental rights.  Mother appeals.

¶15     On appeal, Mother argues the District Court abused its discretion when it terminated her parental rights without a "conclusive determination" that J.K.S.-L. was not eligible for enrollment in a tribe.  Additionally, Mother argues reasonable efforts were not made by the Department prior to the court's determination they were not required.

¶16     "We review a district court's decision to terminate parental rights for abuse of discretion, determining whether the court's underlying factual findings were clearly erroneous."  *In re L.F.R.*, 2019 MT 2, ¶ 6, 394 Mont. 61, 432 P.3d 1030 (citing *J.M. v. R.H.*, 2015 MT 231, ¶¶ 11-12, 380 Mont. 282, 354 P.3d 626).  "A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice."  *Langford v. State*, 2013 MT 265, ¶ 10, 372 Mont. 14, 309 P.3d 993 (citing *State v. Rovin*, 2009 MT 16, ¶ 23, 349 Mont. 57, 201 P.3d 780).

¶17 This Court "review[s] a district court's findings of fact to determine if they are clearly erroneous." *In re S.S.*, 2022 MT 75, ¶ 12, 408 Mont. 238, 507 P.3d 1161 (citing *In re J.S.*, 2014 MT 79, ¶ 14, 374 Mont. 329, 321 P.3d 103). "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with the definite and firm conviction that a mistake has been committed." *In re S.S.*, ¶ 12 (citing *In re J.S.*, ¶ 14).

¶18 We first consider whether the District Court erred when it determined J.K.S.-L. was not an Indian child. "ICWA defines an 'Indian child' as a person 'under age eighteen' who is either 'a member of an Indian tribe' or 'eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.'" *In re L.H.*, 2021 MT 199, ¶ 11, 405 Mont. 173, 492 P.3d 1218 (citing 25 U.S.C. § 1912(a)). A district court errs when, during an involuntary foster care or parental rights termination, it "proceed[s] without applying the requirements and standards of ICWA when it ha[s] *reason to know* [c]hildren were Indian children and it did not have a conclusive determination from the tribe as to [the c]hildren's eligibility for membership." *In re S.B.*, 2019 MT 279, ¶ 29, 398 Mont. 27, 459 P.3d 214 (emphasis added). We have explained, "reason to know" means "'no more than awareness of a reasonable basis upon which to believe' that the subject child is an Indian child." *In re L.H.*, ¶ 11. Factors relevant to the determination will vary and are dependent on the circumstances of each case but nonetheless "requires something more than a bare, vague, or equivocal assertion of possible Indian ancestry without reference to

any identified Indian ancestors with a reasonably suspected tribal connection." *In re L.H.*, ¶ 11.

¶19 Here, the record shows that both the District Court and the Department inquired as to J.K.S.-L.'s Indian status on several occasions. At an EPS hearing on September 27, 2022, the District Court asked both parents whether they had any knowledge concerning J.K.S.-L.'s Indian status. Mother replied "[h]e's not enough enrolled. I'm only three eighths and he's not enough. We tried." The District Court then asked Father, who advised he was not Indian and was not a member of a tribe. On October 4, 2022, the Fort Belknap Indian Community—Mother's Tribe—sent a letter to the court explaining that "it ha[d] been determined based on our records that [J.K.S.-L.] is not enrolled nor eligible for enrollment with the Fort Belknap Indian Community."

¶20 As a precautionary measure, the District Court inquired again on December 13, 2022, and Mother replied:

Court: You're enrolled?
Mother: Yes. [J.K.S.-L.] wasn't enrollable in the last cases.
Court: Okay. And that's been established?
Mother: Yes. He's not enrollable.

The District Court further inquired whether there was any other tribe with which J.K.S.-L. might be enrollable. Mother advised her father was enrolled in the Turtle Mountain Tribe but that he was not on her birth certificate, she was not enrolled in the tribe, and she did not believe J.K.S.-L. would be eligible. The Department secured a letter from the Turtle Mountain Tribe on January 23, 2023, informing it that J.K.S.-L. was neither a member nor eligible for enrollment.

11

¶21 Mother cites *In re L.D.*, in which this Court held that a district court had abused its discretion when it terminated a mother's parental rights "without a conclusive tribal determination of tribal membership status and enrollment eligibility." 2018 MT 60, ¶ 18, 391 Mont. 33, 414 P.3d 768. However, in *In re L.D.*, the district court relied solely on the parents' statements and inaction by the tribe which was contacted to determine that the child was not Indian. We reversed, explaining "there is no evidence that the Department ever formally sought or received a conclusive tribal determination that L.D. was or was not eligible for tribal enrollment." *In re L.D.*, ¶ 15. In contrast, the Department here contacted and received confirmation from both Mother's and Grandfather's tribes that J.K.S.-L. was not enrollable. Contrary to Mother's claim that the letter from the Turtle Mountain tribe was inconclusive as to J.K.S.-L.'s eligibility for membership as Grandfather's name was not on the paperwork, the letter also stated that "[Mother] is not enrolled with the [] Turtle Mountain Band of Chippewa. The child/ren is not eligible for enrollment with the Tribe." This document was served to both parties and Mother, neither of which filed an objection. Based on this record we conclude there was no "reason to know" that J.K.S.-L. was an Indian child prior to terminating Mother's parental rights. Diligent efforts were made to contact all potential tribes and the Department received confirmation from the tribes that J.K.S.-L. was not eligible for enrollment.

¶22 We next consider whether the Department failed to conduct reasonable efforts while its petition for no reunification efforts was pending, thereby allegedly violating Mother's due process rights. The State responds that Mother failed to argue at trial that her due

process rights were violated and therefore did not preserve a due process claim on appeal. The State cites *In re R.K.* in which we held that a mother who did not raise a due process violation before the district court waived any alleged notice issues on appeal. 2023 MT 161, ¶ 24, 413 Mont. 184, 534 P.3d 659. Alternatively, the State argues that even assuming we do review Mother's claim, her right to due process was not violated. On this record, it is simpler to address Mother's due process claim.

¶23 Mother has an extensive history of substance abuse which has led to J.K.S.-L.'s removal from her care on multiple occasions. J.K.S.-L. was adjudicated as a YINC on three separate occasions in his four years of life. When J.K.S.-L. was removed from her care the third time, his hair tested positive for amphetamines, methamphetamines, marijuana, and fentanyl at very high levels. J.K.S.-L. had surgery to remove his tonsils and adenoids and the surgeon removed meth paper that was lodged in both sides of his nostrils. His foster mother testified that he had behavioral issues, they were getting better.

¶24 Following J.K.S.-L.'s third removal, Mother continued to test positive for multiple illegal substances. Throughout this time, both Mother and Father were offered services by the Department, including drug treatment. Mother argues that the Department failed to actively assist her in getting into treatment. However, "[a] parent has an obligation to avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan." *In re R.L.*, 2019 MT 267, ¶ 20, 397 Mont. 507, 452 P.3d 890. Although the Department is required to "diligently attempt to contact

13

reluctant parents and engage them with services[,]" the parent still has an obligation to utilize those services. *In re R.L.*, ¶ 22. Here, Mother failed to do that.

¶25 Even after the Department provided Mother with a gas card to facilitate an in-person meeting with J.K.S.-L., Mother did not go and did not inform the Department until 15 minutes after the scheduled meeting time. When questioned by the District Court, Mother stated she did not go because of car trouble but that her car was now fixed. The visit the following week was postponed due to J.K.S.-L.'s nasal surgery but when asked if she had made any attempts since then to meet with J.K.S.-L., Mother responded "I have not." The District Court asked Mother about the single video chat she had between J.K.S.-L., Father, and herself, which Mother described as not having gone well because J.K.S.-L. did not want to interact with her. When asked whether—apart from that one short video chat— Mother had made any other attempts to chat with J.K.S.-L. over video, Mother simply responded "[n]o, because -- no."

¶26 Mother asserts on appeal the Department did not make reasonable efforts to get her into treatment and enable her to spend time and reunify with J.K.S.-L. As this Court has previously held, "[t]he Department must make reasonable efforts to reunite parents with their children, *not herculean efforts*." *In re R.L.*, ¶ 20 (citing *In re R.J.F.*, 2019 MT 113, ¶ 38, 395 Mont. 454, 443 P.3d 387) (emphasis added).

¶27 We conclude on this record the Department conducted reasonable efforts while its petition for no reunification efforts was pending, and that Mother's due process rights were not violated. We also conclude that the District Court did not err when it determined that

Mother had subjected J.K.S.-L. to "chronic, severe neglect" pursuant to § 41-3-423(2)(a), MCA, and that it was not necessary for the Department to make reasonable efforts towards reunification.

¶28    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶29    Affirmed.

/S/ Laurie McKinnon

We Concur:

/S/ James Jeremiah Shea
/S/ Beth Baker
/S/ Ingrid Gustafson
/S/ Jim Rice