DA 14-0348

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 116

IN THE MATTER OF:

A.K. and K.G.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause Nos. DN 12-30 and DN 12-31
Honorable Karen Townsend, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jeanne M. Walker, Hagen & Walker, PLLC, Billings, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney; Matthew Lowy, Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  February 25, 2015
Decided:  April 28, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    M.K. (Father) appeals an order of the Fourth Judicial District Court, Missoula County, terminating his parental rights to his children, A.K. and K.G. We restate Father's issues and address them as follows:

1. *Whether the District Court abused its discretion in terminating Father's parental rights.*

2. *Whether the District Court erred in concluding that the Department of Public Health and Human Services complied with its statutory duty to provide reunification services.*

¶2    We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    In 2010, the Department of Public Health and Human Services (Department) began receiving reports that Father and J.G. (Mother) were putting their children, A.K. and K.G., at risk of abuse or neglect. In the spring of 2012, Child Protection Specialist Taryn Kovac interviewed family members and prepared a thirty-day "present danger plan." During the interviews, Kovac noted that Father made several false misrepresentations, and that he became loud and angry when she confronted him with facts contradicting his statements. Although the present danger plan allowed Father to visit with A.K. and K.G. under Department supervision, Father did not exercise that right during the thirty-day period. The Department ultimately determined that the present danger plan was insufficient to protect A.K. and K.G.

¶4    On April 19, 2012, the Department filed petitions for emergency protective services, adjudication as youths in need of care, and temporary legal custody. The

2

petitions alleged that Mother and Father put A.K. and K.G. in danger of exposure to neglect, physical abuse, physical neglect, psychological neglect, psychological abuse, domestic violence, mental health issues, drug and alcohol abuse, unstable housing, an unsafe living environment, unknown/prohibited caregivers, Father's criminal history, and the parents' failure to intervene or eliminate the risk of harm. The social worker's attached report documented the Department's concerns that, despite the Present Danger Plan, Mother "remains in protection mode, defending [Father], diminishing her protective capacities and placing the children at risk." The report observed that Mother's actions demonstrated "typical behavior for victims of domestic violence." On June 19, both parents stipulated to the requested relief, and the court granted temporary legal custody to the Department for six months. The children were placed with their maternal grandmother while the Department prepared treatment plans for both parents. Meanwhile, Father completed a psychological evaluation with Dr. Samantha Wildeman and a dangerousness assessment with Ric McLeod, a licensed professional counselor. Dr. Wildeman diagnosed Father with Personality Disorder Not Otherwise Specified (NOS) with narcissistic, histrionic, and obsessive-compulsive features. McLeod determined that Father was in high risk categories for physical, psychological, and emotional dangerousness. Both reports noted that Father had a tendency to deflect blame onto others.

¶5 In May, Evolution Services, which provides support programs for families, began supervising semiweekly visits between the parents and their children. Between May and

December, Father participated in at least twenty-four supervised visits. Evolution Services staff did not note any serious issues between Father and A.K. during those visits. Also in May, both parents began compliance coaching and Evolution Services' Circle of Security program.

¶6 On August 7, Father stipulated to the tasks and obligations set forth in his treatment plan. On August 15, both parents stipulated to a No Contact Order. On September 4, the court ordered Mother's treatment plan and granted Father's motion to amend two tasks in his treatment plan.

¶7 On October 30, the Department reported that Mother had completed all of the tasks in Phase One of her treatment plan, and it moved to extend temporary legal custody for an additional six months. By December 4, 2012, Mother was reunited with both children. Also in December, the Department discontinued visits between Father and A.K. following the advice of the children's therapist, Margot Luckman. Luckman advised that the visits should cease because A.K. was fearful and anxious in sessions with Father, and A.K. was physically aggressive toward Mother and caregivers during the time period when he was visiting with Father. Father objected. After holding two separate hearings, the court decided not to overrule the Department's decision. Six months after Father stopped visiting, A.K. was sleeping regularly and was no longer demonstrating fear and anxiety or aggressive behaviors.

¶8 On January 15, 2013, Mother and Father stipulated to a three-month extension of temporary legal custody. In March, Father initiated individual therapy with Tiffany

4

Bartolomei, a licensed professional counselor. Father continued therapy with Bartolomei throughout the proceedings. On April 16, Mother and Father stipulated to another three-month extension of temporary legal custody. Starting in June 2013, Evolution Services conducted six random home visits, each time finding Father's home satisfactory, though the visits eventually ceased when staff no longer found anyone at home.

¶9 At a status conference on June 4, Father requested a six-month extension of temporary legal custody and asked the Department to take steps immediately to reunite him with his children. The Department reported that the children were doing well with Mother, who had complied fully with her treatment plan. Father had not yet complied with his plan, however, and the Department reported that its reasons for involvement— domestic violence and lack of protective capacity—were still a concern.

¶10 The Department advised the court that, when it initially intervened with the family, Father told Mother that he would not cooperate with the Department, that Mother would do all the work to get the case dismissed, and that after dismissal Father would fight for full custody in a separate proceeding where neither party was represented by counsel. The Department advocated for extending temporary legal custody because Father continued to demonstrate the power and control issues that necessitated the Department's involvement in the first place. The Department wanted more time to see if Father could follow through with his treatment plan in order to protect the children's best interests. Father's counsel complained that the Department was not making sufficient efforts to reunite Father with A.K. and emphasized that Father had a fundamental right to

5

be a parent. The court extended temporary legal custody to allow further time for Father to work on his treatment plan.

¶11 On July 18, the court held a hearing on reunification and visitation between Father and A.K. According to Father's counsel, Father's sole reason for requesting an extension of temporary legal custody at the June 4 hearing was for the Department to make efforts to reunite him with his children, which had not happened. Father now wanted the Department's case dismissed so that he could file for custody and work out a parenting plan. The Department resisted dismissal because Father had not shown the change that would be needed before reinitiating his visits with A.K. Luckman testified that, if the case were to be dismissed, Mother may be capable of protecting the children from Father, but her protective capacity depended on Father's actions. The Court Appointed Special Advocate (CASA) volunteer, who supervised visits at Evolution Services, testified that she had not observed any indication that Father had changed since she first met him in June 2012.

¶12 The hearing was continued to August 28 to allow testimony by Dr. Paul Silverman to clarify a January 2013 evaluation of Father's parental competence conducted by Dr. Silverman. During the evaluation, Dr. Silverman had observed Father interacting with A.K. and noted that Father was "very self-focused," that he engaged in a concerning "joking but slightly threatening interaction" with A.K., and that A.K. committed self-harm by hitting himself in distress. Dr. Silverman testified that, although the children's therapist should not be the sole decision-maker as to reunification, she would

6

have the best knowledge of A.K.'s psychological state and could provide valuable information about the children's well-being. Dr. Silverman further testified that it was "very important" for Father to actually complete his treatment plan. He recommended psychotherapy and careful monitoring of Father's progress, and he did not think it was a good idea for the parents to be involved together with A.K.

¶13 The parties also discussed whether the case should be dismissed. Father's counsel objected to dismissal because Department funding would be needed to continue supervised reunification efforts. The Department emphasized that it needed to continue to act as a buffer between Father and the family to protect the children. The parties agreed to involve a third therapist, Dr. Danette Wollersheim, to liaise between Luckman and Bartolomei, and to oversee the initiation of therapeutic or supervised visits between Father and A.K. The court extended temporary legal custody for six more months so that the Department could control visitation between Father and A.K. until Father showed more progress on his treatment plan.

¶14 In November and December, Father twice visited A.K. in Dr. Wollersheim's presence. At a status conference in December, Mother reported that A.K. had regressed since he started visiting with Father. The Department advised the court that it would file a petition to terminate Father's parental rights. On January 13, 2014, Father signed an agreement with Evolution Services for random urinalysis (UA) testing. Father provided four UA specimens—three specimens were clean and one was diluted—but was

discharged from the program when he failed to appear for twelve additional UAs. On January 24, the Department filed a Petition for Termination of Father's parental rights.

¶15    On February 5, the court held a hearing to discuss additional visitation between Father and A.K. Mother testified that, when the Department first intervened with the family, Father told her that she was "stupid and [was] going to go through the loop holes and do all the work and he wasn't going to do anything, and the outcome would be the same, it would be just dismissing the parenting plan and then he would . . . fight for full custody." Kovac expressed concern that Father continued to demonstrate issues of power and control by attempting to carry out this threat, and that the lack of protective capacity that led to the Department filing the case was not resolved. Kovac testified that, although every resource that the Department offered to Mother was twice offered to Father, Mother took advantage of the resources and completed every task to be reunited with her children, while Father did not. The parties presented conflicting testimony from Bartolomei, Luckman, Kovac, and Dr. Wollersheim. Thereafter, the court entered an order suspending visits between Father and his children.

¶16    On April 21 and 25, the court held a termination hearing. The Department's petition alleged that Father had not successfully completed his treatment plan, and that his behavior was unlikely to change within a reasonable time. Father's brief argued that the Department unfoundedly prevented him from contact with his children, that a delay in completing certain treatment plan tasks was due to his busy work schedule, and that he had completed his parenting plan and was no longer a danger to his children.

¶17 During the termination hearing, the court heard conflicting testimony. Kelli Caballero, a compliance and parenting coach at Evolution Services, and Dr. Wollersheim recommended more visits monitored by Evolution Services. McLeod recommended against termination because he thought treatment was working. In contrast, the CASA volunteer recommended termination because contact made A.K. anxious and Father had shown a lack of interest in K.G.; Luckman recommended termination because contact caused trauma to A.K.; and Kovac recommended termination because Father had not demonstrated responsibility or insight into how his behavior needed to change. Father and Mother also both testified. Father opposed termination while Mother supported it.

¶18 The District Court found that Father had completed certain of his treatment plan tasks: Circle of Security classes; the CAVE anger management program; meeting with Childhood Development Center officials to discuss K.G.'s development stages; individual therapy sessions; feedback sessions for McLeod's dangerousness assessment and Dr. Wildeman's psychological evaluation; and a parenting assessment. However, the court found that Father did not make his required monthly contact with Luckman until after the Department filed its petition to terminate his parental rights, and that Father had repeatedly refused to work with Kovac or to communicate with the CASA volunteer. At trial, Father submitted several text messages that he alleged evinced his repeated attempts to contact Kovac without response. The court discovered that Father had deleted many of Kovac's responses before presenting the text messages to the court. The court found that

Father had not complied with his treatment plan, despite the Department's reasonable efforts to restore the parent-child relationship.

¶19 The District Court further found that neither therapist who recommended continued supervised contact between Father and A.K. had accounted for the psychological damage to A.K. following visits with Father or for Father's inability to understand how his conduct affected A.K. The court found Mother's testimony that Father had exposed her to physical violence in front of A.K. to be credible, despite Father's denial that he had been physically violent. Finally, the court found that establishing permanency was in both children's best interests and that, although Father had made "some progress" over the previous two years, he was unlikely to become a fit parent within a reasonable time. The court determined that clear and convincing evidence supported terminating Father's parental rights.

## STANDARDS OF REVIEW

¶20 We review a district court's decision to terminate parental rights for abuse of discretion. *In re L.N.*, 2014 MT 187, ¶ 12, 375 Mont. 480, 329 P.3d 598. We review a district court's findings of fact for clear error. *L.N.*, ¶ 12. A parent's right to the care and custody of a child is a fundamental liberty interest that must be protected by fundamentally fair procedures. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. Courts must give primary consideration to the "physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA. A child's best interests

10

take precedence over parental rights. *In re Matter of E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690.

## DISCUSSION

¶21 *1. Whether the District Court abused its discretion in terminating Father's parental rights.*

¶22 Under § 41-3-609(1)(f), MCA, a court may terminate parental rights to a non-Indian child if it finds, by clear and convincing evidence, that:

> [T]he child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

In parental rights cases, clear and convincing evidence is "simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof." *D.B.*, ¶ 29 (quoting *In re F.M.*, 2002 MT 180, ¶ 48, 311 Mont. 35, 53 P.3d 368). It "does not call for unanswerable or conclusive evidence." *In re J.M.W.E.H.*, 1998 MT 18, ¶ 33, 287 Mont. 239, 954 P.2d 26 (quoting *In re J.L.*, 277 Mont. 284, 289, 922 P.2d 459, 462 (1996)).

> *A. Whether the Department failed to act in good faith in implementing Father's treatment plan.*

¶23 Effectuating an appropriate treatment plan requires the Department "to act in good faith . . . to preserve the parent-child relationship and the family unit," a requirement that "does not end once the court has approved [the] treatment plan." *D.B.*, ¶ 33 (citations

11

omitted). Father stipulated to the treatment plan and does not dispute on appeal that the requirements of his treatment plan were appropriate. Rather, Father argues that the Department did not execute his plan in good faith because the Department favored Mother, was biased against Father, and "violated statutory procedures by refusing to dismiss the case against . . . Mother in order to ensure that she had an attorney at State expense to protect her parental interest against . . . Father." According to Father, the Department was "mandated" to dismiss its case against Mother six months after reports of abuse or neglect ceased.

¶24 Under § 41-3-424, MCA, dismissal is appropriate when all of the following criteria are met:

> (1) a child who has been placed in foster case is reunited with the child's parents and returned home; (2) the child remains in the home for a minimum of 6 months with no additional confirmed reports of child abuse or neglect; and (3) the department determines and informs the court that the issues that led to department intervention have been resolved and that no reason exists for further department intervention or monitoring.

The Department determined that monitoring the children's reunification with Mother was necessary in continuing the efforts to reunite the children with Father and to monitor Mother's and Father's ability to co-parent, particularly in light of the domestic violence history. The issues that led to Department intervention—domestic violence and lack of protective capacity—remained unresolved. In order for the family to be successful, Mother and Father needed to be able to co-parent even if they were separated. The Department was concerned that Father's consistent unwillingness to participate in treatment would lead to continued risk to the children, and that Mother would be unable

12

to protect the children from Father's power-play of refusing to cooperate with the Department while Mother completed her tasks so that the Department would dismiss the case and Father could fight for custody in court.

¶25 Father also pressed for additional time to work on reunification with A.K. He stipulated to two three-month extensions of temporary legal custody in the beginning of 2013 and suggested a six-month extension at the June 4, 2013 hearing. Father sought dismissal only when the Department did not agree that he was ready for visitation with A.K. At the August 28, 2013 hearing, however, Father objected to dismissal in order to continue to receive reunification services from the Department.

¶26 The Department moved several times to extend temporary legal custody to give Father an opportunity to demonstrate follow-through on his treatment plan. While Father faults the Department, the record reflects his conscious decision not to participate in some of the offered services, which contributed to the treatment plan's lack of success. Although the Department could have sought dismissal of Mother, the statute did not require the court to dismiss the petition against her in these circumstances.

¶27 The court kept the matter open because both parties had made clear that continued Department services were necessary for Father to build a relationship with his children. The court voiced its concern that, if the case were dismissed, the parties "would be tossed into a parenting plan action and we wouldn't have the resources that we have got here to try and figure out whether there would be any future visitation" between Father and his children. The court did not abuse its discretion in keeping the matter open because the

issues that led to the Department's intervention remained unresolved. Despite Father's assertions, the record does not show that the Department acted in bad faith, was biased against Father, or favored Mother to Father's detriment in implementing the treatment plan.

*B. Whether the District Court erred in finding that Father failed to comply with his treatment plan.*

¶28 Although Father admits that he did not complete every task of the plan, he argues that he completed those tasks that were "necessary." "A parent does not successfully complete a treatment plan by partial, or even substantial, compliance." *In re I.B.*, 2011 MT 82, ¶ 27, 360 Mont. 132, 255 P.3d 56 (citations omitted). Even if a parent technically completes all of the tasks in a treatment plan, he does not successfully complete the plan unless he "effectuates the purposes for which the plan [was] designed." *I.B.*, ¶ 27 (citing § 41-3-609(1)(f)(i), MCA). A court must "do more than mechanistically check items off a task list," and instead determine whether the parent has "actually effectuated the purposes of the treatment plan." *I.B.*, ¶ 27 (citations omitted).

¶29 The court found that Father had not complied with all of his tasks or effectuated the purpose of his treatment plan: Father continued to deflect blame for his situation on the Department; he did not make monthly contact with the children's therapist until after the Department filed the petition for termination of parental rights; he demonstrated a lack of interest in his children's well-being and particularly in his daughter, K.G.; he repeatedly failed to show up for necessary appointments; and he repeatedly refused to work with Kovac over the course of two years or to communicate with the CASA

14

volunteer. Father argues that his refusal to work with Kovac, Luckman, and the CASA does not make him unfit to parent. But the statute requires that the treatment plan be "complied with by the parents" and that it be successful. Section 41-3-609(1)(f)(i), MCA. The District Court found that Father's required contact with A.K.'s therapist was central to effectuating the treatment plan's objective for Father to understand how his conduct affects his son. The court concluded that Father's conduct demonstrated a refusal to accept full responsibility for the removal of his children and showed that he had not made the changes necessary to foster a healthy relationship with them. The record is sufficient to support the District Court's finding that Father failed to comply with his treatment plan.

*C. Whether the District Court erred in finding that Father's parental unfitness is unlikely to change in a reasonable time.*

¶30 A district court, in determining whether the conduct or condition rendering a parent unfit is unlikely to change within a reasonable time, must enter a finding that continuing the parent-child legal relationship "will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. This analysis requires the court to consider several factors including, but not limited to, the parent's

> mental deficiency . . . of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time; . . . history of violent behavior by the parent; [and] excessive use of intoxicating liquor or . . . drug[s] that affects the parent's ability to care and provide for the child . . . .

15

Section 41-3-609(2), MCA. The court also must consider "past and present conduct of the parent." *In re J.C.*, 2003 MT 369, ¶ 11, 319 Mont. 112, 82 P.3d 900. *See also In re C.A.R.*, 214 Mont. 174, 188, 693 P.2d 1214, 1222 (1984) (mother's conduct was unlikely to change when mother did not show progress rehabilitating until under threat of petition to terminate her parental rights).

¶31 Although Father points to the testimony of two expert witnesses who did not believe termination was appropriate, "the existence of conflicting evidence does not preclude a trial court's determination that clear and convincing evidence exists to support a finding of fact." *In re M.F.B.*, 2001 MT 136, ¶ 19, 305 Mont. 481, 29 P.3d 480 (citations omitted). *See also J.M.W.E.H.*, ¶ 34 ("[T]he fact that Appellant's testimony conflicts with other witness testimony, or the fact that the witnesses' allegations are based on inferences, does not automatically preclude the court from finding that Appellant violated her treatment plan."). A district court has discretion to weigh expert testimony and determine witness credibility. *J.M.W.E.H.*, ¶ 34. This Court does not "substitute [its] evaluation of the evidence for that of the trial court, or pass upon the credibility of witnesses." *J.M.W.E.H.*, ¶ 34 (quoting *J.L.*, 277 Mont. at 290, 922 P.2d at 462).

¶32 After conducting several hearings and listening to conflicting testimony, the District Court decided that the Department had met its burden to terminate Father's parental rights. The court determined that the conduct or condition rendering Father unfit was unlikely to change within a reasonable time because Father addressed tasks on his treatment plan only when pushed; he continuously failed to show up for scheduled

16

appointments; he was discharged from rehabilitation programs for lack of compliance; he refused to meet with his children's therapist to learn about their needs; and he refused contact with the Department's Child Protection Specialist. The court also considered Father's observed tendency to externalize blame, including at trial when he presented incomplete text messages as evidence of Kovac's alleged failure to communicate with him; his history of domestic violence; and Dr. Wildeman's diagnosis of Personality Disorder NOS with narcissistic, histrionic, and obsessive-compulsive features. The court noted that Father demonstrated a lack of concern for his children's well-being and did not ask professionals important questions about his children's activities and behavior.

¶33 There is a strong correlation between violence toward a partner and child abuse, and "childhood exposure to domestic violence should be taken just as seriously as child abuse." Brandi Ries & Hilly McGahan, *Sometimes the Cases that Nobody Wants can have the Greatest Impact*, 40 Mont. Lawyer 6 (State Bar Mont.), April 2015, at 15 (citing National Clearinghouse on Child Abuse and Neglect, *In Harm's Way: Domestic Violence and Child Maltreatment* (2003)). "Children and youth who are victims of, or witnesses to, violence often suffer long-term emotional distress and physical consequences. When these problems remain unaddressed, children are at higher risk for school failure, substance abuse, repeated victimization, and perhaps most tragically, perpetuating violent behavior later in their own lives." U.S. Dep't of Justice, National Advisory Committee on Violence Against Women, *Final Report* 1 (June 2012).[1] Although two experts who

---

[1] *Available at* http://perma.cc/RDX4-GWX8.

had worked with Father recommended continued supervised contact between Father and A.K., the court found that neither witness accounted for the psychological damage to A.K. following those visits, or for Father's inability to understand how his conduct affected A.K. The District Court had discretion in evaluating the conflicting expert testimony, and we will not substitute our judgment for the trial court's resolution of those conflicts.

¶34 Finally, the District Court also had discretion to evaluate the evidence regarding Father's efforts, or lack thereof, to foster a parent-child relationship with his daughter, K.G. The record does not support Father's claim of clear error in the court's findings that Father did not take active steps in this regard and that, in light of all of the evidence, Father's conduct was not likely to change within a reasonable time.

¶35 We conclude that the District Court did not abuse its discretion in terminating Father's parental rights. The court based its decision on clear and convincing evidence and properly applied the legal standards governing termination.

¶36 *2. Whether the District Court erred in concluding that the Department complied with its statutory duty to provide reunification services.*

¶37 Under § 41-3-423(1), MCA, the Department must make "reasonable efforts" to reunite families that it has separated. "Reasonable efforts include but are not limited to voluntary protective services agreements, development of individual written case plans specifying state efforts to reunify families, . . . provision of services pursuant to a case plan, and periodic review of each case to ensure timely progress toward reunification . . . ." Section 41-3-423(1), MCA. "Although the State may assist the

18

parents in completing the treatment program, the parents retain the ultimate responsibility for complying with the plan." *In re R.H.*, 250 Mont. 164, 171, 819 P.2d 152, 156 (1991) (citing *In re L.W.K.*, 236 Mont. 14, 19, 767 P.2d 1338, 1342 (1989)).

¶38 The District Court specifically found that the Department made "reasonable efforts in an attempt to restore the parent-child relationship" by funding evaluations, assessments, supervised visitations, compliance coaching, and therapy. The Department developed an individual case plan specifying its efforts to reunite Father with his children, provided services under that plan, and periodically reviewed the case by conducting evaluations and holding hearings to extend temporary legal custody. The record reflects roughly a dozen hearings or conferences with the court over a period of two years before the case proceeded ultimately to a termination hearing. Father received additional services when temporary legal custody was extended and Dr. Wollersheim was brought in to facilitate Father's reunification with his children. In evaluating the Department's reasonable efforts to achieve reunification, "each case must be evaluated on its own facts." *In re K.L.*, 2014 MT 28, ¶ 41, 373 Mont. 421, 318 P.3d 691. Although Father faults the case worker for failing to investigate other possible reasons for A.K.'s regression after the visits with Dr. Wollersheim, the District Court determined that it was Father's own behavior that resulted in his unsuccessful attempt to reinstate visits with the children and the ultimate failure of his treatment plan.

¶39 The District Court did not err by finding that the Department made reasonable efforts to reunite Father with his children.

19

¶40    We conclude that the District Court did not abuse its discretion in terminating Father's rights.  The District Court's factual findings are supported by the record, and the court did not err in finding that the Department made reasonable efforts to reunite Father with his children.  We affirm the District Court's decision and order.


/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT


Justice Laurie McKinnon, dissenting.

¶41    I dissent.  It appears that the Department became an advocate not for A.K. and K.G., but for Mother.  The termination proceedings against Father were used to shield Mother from the potential difficulty of navigating a separate parenting plan proceeding, during which she would likely not be represented by counsel.  I believe this was an inappropriate application of our statutes granting the Department authority to protect the health and safety of children.  Because the record, in my view, demonstrates that the Department's aim was to protect Mother by removing Father from the children's lives, I cannot agree with the Court's conclusion that the Department acted in good faith in

developing and executing a treatment plan to preserve Father's relationship with A.K. and K.G. Opinion, ¶¶ 22-26.

¶42 The Department's involvement in this case was premised upon allegations that the children witnessed an abusive relationship in which Father, a narcissistic and manipulative personality, exerted power and control over Mother, who suffered from depression. Initial reports were concerned with Mother's inconsistency in taking her medication, her ability to provide for the children's needs during depressive episodes, and her ability to protect the children from Father's domineering influence. Because it was the dynamic between the parents that led to the Department's involvement, the Department's role was to ensure the safety and security of the children by making sure at least one parent was able to protect the children from the unhealthy dynamics of the parents' relationship. The Department's role became distorted, however, and the line between a child abuse and neglect proceeding and a parenting plan action became blurred.

¶43 The Court similarly loses sight of this distinction in its desire to recognize a correlation between violence toward a partner and violence toward a child, rather than focusing on whether the Department was committed to ensuring that a parent, given the dynamics of an abusive relationship, could nevertheless be relied upon to protect the children. No party has disputed that the domestic violence in these proceedings was rightfully a concern of the Department in protecting these children and that these children were abused and neglected as a result of domestic violence. The focus, however, should

21

not be on master-minding a dissolution for the parties and advocating on behalf of one parent. The Department's focus should rather be on the safety of the children and ensuring that one parent possesses the necessary skills to protect the children. As an aside, the Court's reference to studies, data, and opinions which were not part of the record in the underlying proceedings is inappropriate and unnecessary. Opinion, ¶ 32. It is axiomatic that we are, for good reason, limited to the record before us and may not rely on information not presented to the trial court, despite how obvious or apparent the conclusions, opinions, or data may appear. This is premised on the fundamental principle that evidence is to be presented in the trial court. Evidence would include studies and opinions which a judicial officer relies upon in making her decision. The careless recitation of even seemingly obvious information provides authority for subsequent litigants to use without the information ever having been first presented, tested, or considered in a trial court.

¶44 By all accounts, Mother completed the requirements of her treatment plan fairly quickly and was reunited with the children. Her treatment plan does not appear in the District Court record, but according to testimony, focused on the development of her ability to protect the children from Father. At the October 30, 2012 status conference, it was anticipated that Mother would be given a Phase II treatment plan. It appears that this was not followed through. The Department instead kept Mother's case open for monitoring. Seven months later, at the June 4, 2013 status conference, it was clear that the focus had shifted from developing Mother's own protective abilities to actively

22

advocating for Mother. Counsel for Mother stated that she would not contest extending temporary legal custody—although the children had been returned to her care several months earlier—"not necessarily on the fact that the kids continue to need monitoring but [because] the mother really appreciates the services, helps her out quite a bit." The Department then stated that although it could dismiss the case and place the children with Mother, it would instead extend temporary legal custody in order to avoid an attempt by Father to initiate a separate parenting plan proceeding. Although a dependency and neglect proceeding had been open against Father for 13 months by the time of the June 4 status conference, the Department admitted that it did not have clear and convincing evidence supporting termination of Father's rights. Counsel for Father was understandably frustrated and confused by the direction of the proceedings, stating:

> Your Honor, I just want to make sure I'm clear where we're going with this. Barring termination or relinquishment, parenting is a fundamental right he has. . . . If this were not involved with [the Department] we'd be here in a [domestic relations] case. . . . And a parenting plan would be put in place, worst case would be supervised visitation. I'm not quite sure where we're going with this.

Child protection specialist Taryn Kovac responded, "[T]his is the time that [Mother] is advocating for her children's safety and demonstrating her ongoing protective capacity and her entire life change."

¶45 Father is correct that at this point, when the Department represented that Mother had completed her treatment plan and it was no longer concerned about her protective capacity and ability to meet the children's needs, the case should have been dismissed.

23

Section 41-3-424, MCA, requires a court to dismiss a case, even if no party has moved for dismissal, in the following circumstances:

(1) a child who has been placed in foster care is reunited with the child's parents and returned home;
(2) the child remains in the home for a minimum of 6 months with no additional confirmed reports of child abuse or neglect; and
(3) the department determines and informs the court that the issues that led to department intervention have been resolved and that no reason exists for further department intervention or monitoring.

In this case, the children had been returned from foster care to Mother's home, had remained in Mother's home for over six months with no additional reports of abuse or neglect, and the Department had repeatedly informed the court that Mother had completed her treatment plan and was successfully demonstrating protective capacity. The relationship between Mother and Father had ended, Father was no longer residing in the home with Mother, and Mother was capable of understanding and protecting the children from the effects of an abusive relationship. The appropriate action was to allow the children to remain in Mother's care while the parties pursued a suitable parenting plan, with supervised visitation if necessary. Mother had already demonstrated her ability to protect and advocate for her children, and the abuse and neglect proceeding was not, as Kovac stated, the time for Mother apply that ability. Instead, an appropriate parenting plan action between Mother and Father was the proper venue for Mother to apply her protective capacity.

24

¶46 When the case was not dismissed, the Department found itself embroiled as an advocate in a custody battle. This appears to have been the Department's intention. At a status conference on December 17, 2013, counsel for the Department stated that Mother

> could have been dismissed from this case years ago, but for the fact that everyone wants her to have counsel and be represented by an attorney, that's the only reason she continues, is so she can continue to have her lawyer to represent her and protect her parental rights.

It is also clear that termination, rather than reunification, was viewed as the most likely outcome of the proceedings from the beginning. At the February 5, 2014 hearing on Father's visitation, Dr. Wollersheim testified that Mother "was under the impression that [Father] was going to go away, that his rights were going to be terminated and she would be a single mom, she could parent as she wished." She also testified that she did not believe the current treatment team was "a good venue" for addressing Father's needs, because of "really deep conflicts between [Father] and the Department." Dr. Wollersheim observed

> a very strong difference in this case, in my perception of how the mother has been treated and how the father has been treated. And I'm very glad for what the mom has received. She's had wraparound and wraparound. And from my perception, [Father] has not had that, maybe on the paper, but the whole tone, you can feel it in this room, anybody in that treatment team could also feel that. So we are all human. We all get along with certain people, maybe better than others. So I perceive [Father] has not been offered the same level of emotional support, even though the services look the same on paper.

This raises concerns about the Department's duty to act in good faith when executing a treatment plan designed to preserve the parent-child relationship. *In re D.B.*, 2007 MT

25

246, ¶ 33, 339 Mont. 240, 168 P.3d 691; *In re J.S.*, 269 Mont. 170, 178-79, 887 P.2d 719, 724 (1994) (Gray, J., concurring).

¶47 The record demonstrates that the repeated extensions of temporary legal custody, rather than allowing Father to work toward reunification with the children, allowed the Department to continue building its case in support of termination of Father's parental rights. On June 4, 2013, the Department stated that it could not meet its burden of clear and convincing evidence in support of termination. After that date, the Department initiated additional tasks, including urinalysis testing. Father's treatment plan required him to submit to urinalysis only if the Department had cause to believe he was abusing alcohol or drugs. This requirement was not initiated until January 2014, and Father's failure to comply was presented as evidence supporting termination at the April 2014 termination hearing. Visitation between Father and the children was suspended for nearly a full year, from December 2012 until two visits held in November and December 2013. Counsel for the children was concerned that A.K. was not being adequately prepared by his therapist to resume visitation after such a lengthy period, and Mother stated that on one of the visit dates, she did not even inform A.K. that he was going to see Father. Not unremarkably for a five-year-old child in such circumstances, A.K. did not want to enter the visit and had a toileting accident after the visit was over. This incident was also offered as evidence supporting the termination of Father's rights.

¶48 The District Court had a duty to take an active role in managing the proceedings and directing the Department toward a timely resolution. Instead, it appears that the

26

Department was driving the proceedings. At the December 4, 2012 status conference, counsel for the Department represented to the District Court that the Department had discretion to control visitation, and Father could contest the exercise of that discretion in court if necessary. Two weeks later, the Department reiterated that position but argued against scheduling a hearing on visitation requested by Father. The District Court declined to "overrule" the Department. A year later, on December 17, 2013, when Father requested a hearing on visitation, the Department took issue with the court's authority to "micromanage" visitation, despite its earlier representation that Father could contest the Department's exercise of its discretion. As the District Court was attempting to identify statutory authority that would allow it to require the Department to grant visitation to Father, counsel for the Department stated, "I'll make it easier for you, Judge. Child and Family Services will petition for termination of parental rights." Thus, the Department discouraged the District Court from intervening in the visitation dispute on its own by asserting that Father could contest the Department's exercise of its discretion—but when Father did so, the Department promptly moved for termination of his rights, not in service of the children's interests, but as a procedural expediency. The District Court's deference to the Department and its failure to dismiss the case when appropriate, *see* § 41-3-424, MCA, resulted in this case dragging on far longer than necessary.

¶49 In its order terminating Father's parental rights, the District Court acknowledged that its aim was to establish permanency for the children by

> terminating Father's rights and allowing the Mother to have full custody of these children. Failure to terminate Father's rights will subject the children

27

and their Mother to ongoing litigation in a parenting plan proceeding as Father has stated in the past that he will fight the Mother for 50/50 custody.

While ongoing parenting plan litigation is a complicated and often painful process, it is one many Montana families deal with every day. The perception of the Department or the District Court that the current legal process for resolving family law disputes was inadequate to meet the challenges of this particular case does not justify their creation of an alternative process through manipulation of the laws designed to prevent child abuse and neglect. The need for counsel in family law matters, particularly those involving relationships of power and control, is undeniably great, as is the need for domestic violence advocacy. Neither of those needs, however, may appropriately be filled by the Department through a strained application of our child abuse and neglect statutes. In attempting to provide Mother with those services, the Department did not bear out its duty to act in good faith with respect to Father.

¶50    For the foregoing reasons, I dissent.


/S/ LAURIE McKINNON