FILED

November 10 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0338

DA 15-0338

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 320N

IN THE MATTER OF:

Y. A.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Fifteenth Judicial District,
In and For the County of Roosevelt, Cause No. DN-12-5
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Elizabeth Thomas, Attorney at Law; Hebron, Ohio

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General; Helena, Montana

        Anne Sheehy Yegen, Assistant Attorney General; Forsyth, Montana

        Ralph J. Patch, Roosevelt County Attorney; Wolf Point, Montana

Submitted on Briefs:  September 23, 2015
Decided:  November 10, 2015

Filed:

                            Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 H.A. (Father) appeals an order of the Fifteenth Judicial District Court, Roosevelt County, terminating his parental rights to his daughter, Y.A. We affirm.

¶3 Y.A. was born to Father and N.A. (Mother) in 2003. In 2004, Mother and Father were divorced in Oregon, and Father was granted sole custody of Y.A. Though Father had legal custody of Y.A., Y.A. resided with her maternal grandmother, R.S., several times between the ages of two and seven, including for a period of years between 2007 and 2010.

¶4 In 2010, Father's then-girlfriend, C.B., and her two children moved in with Father. Father also brought Y.A. to live with him. In 2011, C.B. left Father and took Y.A. to R.S.'s home. C.B. later testified that she left Father because she "didn't want [her] kids to get yelled at or be ignored or be abused anymore." C.B. testified that Father "would get drunk every night," that she was afraid of him, and that he abused her in front of the children, including Y.A. C.B. further testified that "the way that [Father] played with kids, that's not how you play with kids," that Father "used to like drop [Y.A.]," and that he was "just really rough." When C.B. brought Y.A. to R.S., Mother and R.S. fled

2

Oregon with Y.A. After moving multiple times, R.S., Mother, and Y.A. settled in northeastern Montana.

¶5 In October and November 2012, the Department of Public Health and Human Services (Department) received three referrals regarding Y.A. The referrals were based on allegations by R.S. and other family members that Y.A. was schizophrenic and had been sexually abused by Father. The Department received the third referral after R.S. brought Y.A. to a hospital. The hospital referred Y.A. to a mental health center and Jennifer Preble, a licensed clinical social worker, conducted a crisis evaluation. Preble diagnosed Y.A. with posttraumatic stress disorder, determined that Y.A. was at a "significant risk of self-harm," and recommended acute psychiatric treatment. Preble also recommended Department intervention, noting that Mother and R.S. were unable to obtain necessary treatment for Y.A. because they did not have legal custody of her.

¶6 On November 21, 2012, the Department filed a petition for emergency protective services and temporary investigative authority. The District Court granted the Department emergency protective services and scheduled a show cause hearing on temporary investigative authority for January 30, 2013. Based on Preble's crisis evaluation of Y.A., Department staff decided to place Y.A. at Shodair Children's Hospital. Neither Mother nor R.S. objected to the Shodair placement.

¶7 At the time of the January 30, 2013 show cause hearing, Y.A. was still being treated at Shodair, and Mother and R.S. were participating in family therapy through Shodair. Shodair reports indicated that Y.A. required ongoing treatment and did not want to talk to or see Father. Preble testified that she had "concerns with [Y.A.]'s ability to

3

cope. She had expressed a lot of fear of her father, had demons, was having difficulty sleeping, difficulty concentrating, difficulty in school, [and] difficulty with her appetite and eating." Y.A. told Preble that demons were talking to her, telling her to hurt herself, and that she was afraid to go to school because of them. Y.A. also told Preble that she was afraid Father would kill her, and that Father had beaten her with a baseball bat in the past. R.S. told Preble she feared for her life and for the life of Y.A. at the hands of Father. Although Father did not personally appear at the hearing, Father's counsel stated that Father objected to the Department's request for emergency protective services and temporary investigative authority but stipulated that Y.A. "is a youth in need of care and needs treatment . . . ." On February 12, 2013, the District Court issued an order continuing emergency protective services and granting the Department temporary investigative authority.

¶8     On May 1, 2013, the Department filed a petition for adjudication of Y.A. as a youth in need of care and for temporary legal custody. The Department attached a supporting affidavit signed by Child Protection Specialist Christina Hughes, who was assigned to the case. Hughes indicated that Y.A. was eligible for enrollment in the Sun'aq Tribe of Kodiak, Alaska, and stated that "the Department is following [Indian Child Welfare Act (ICWA)] requirements." According to Hughes, Y.A. had a diagnosis of bipolar disorder, not otherwise specified, with psychosis; severe, chronic posttraumatic stress disorder with psychotic symptoms; parent-child relationship problems; and severe to catastrophic psychosocial stressors. She had completed residential inpatient treatment at Shodair, was attending aftercare therapy sessions at Eastern Montana Mental Health,

4

and was on a trial home visit at Mother and R.S.'s home. Hughes noted that the Department had no contact with Father "despite several attempts."

¶9 At a June 12, 2013 hearing on the Department's petition, all parties except Father stipulated to adjudicating Y.A. as a youth in need of care. Father did not personally appear at the hearing, though his counsel was present. Linda Resoff, a representative of the Sun'aq Tribe, testified that it would be inappropriate to place Y.A. with Father at that time. Resoff testified that the Tribe believed Y.A. would be likely to suffer from serious physical or emotional harm if she were returned to Father's home. By contrast, Resoff testified that Y.A. could be placed with Mother and R.S. On July 10, 2013, the District Court issued an order adjudicating Y.A. as a youth in need of care and granting the Department temporary legal custody.

¶10 On December 13, 2013, the Department filed a petition to extend temporary legal custody. The case had been transferred from Hughes to Child Protection Specialist Kara Tweten, who signed an affidavit in support of the Department's petition. Tweten stated that Y.A. had been on a trial home visit with Mother and R.S. since April 2013, and that there were no further reports of child abuse or neglect during that period. According to Tweten, Y.A. had no contact with Father and indicated that she did not want contact with Father. Y.A.'s therapist told Tweten that Y.A. was more positive than before, and that her family was supportive and involved with her treatment. Tweten reported that Mother was participating in mental health services, complying with the Department, and able to support Y.A. Tweten noted that Hughes had made several unsuccessful attempts to contact Father. Tweten herself had not yet attempted to contact him.

¶11 On January 10, 2014, the Department filed a "Report to Court for Permanency." In the Report, the Department indicated that it would prepare treatment plans for Mother and Father and recommended that custody of Y.A. be granted to Mother. The Department stated that Father had not been in contact with the Department and had not signed a treatment plan due to a miscommunication with Father's counsel at a prior court hearing. The Department noted that Father was involved in an unrelated open Child Protective Services case in Albany, Oregon, regarding a child he fathered with C.B., and that Father had a treatment plan for that case.

¶12 On January 15, 2014, the District Court held a hearing on the Department's petition to extend temporary legal custody and permanency plan. Father appeared via telephone and testified that R.S. kidnapped Y.A., that Mother was a "druggie," and that R.S. was "crazy." Father's counsel also was present. At the hearing, Tweten testified that she created a treatment plan for Mother, which still needed court approval, and planned on creating one for Father. Tweten further testified that although Mother had not entered a formal treatment plan, she had completed many of the tasks the Department requested. Tweten did not recommend returning Y.A. to Father, noting that Y.A. still expressed fear of Father and wanted to stay with Mother and R.S. Resoff testified that Y.A. was "still fearful" of Father, and that the Sun'aq Tribe believed it would be in the best interests of Y.A. to stay with Mother. At the hearing's conclusion, the District Court granted the Department an extension of temporary legal custody and approved the Department's permanency plan. The District Court approved Father's treatment plan on

March 18, 2014. Father did not sign his plan, though on appeal he concedes that it was "appropriate."

¶13 On July 15, 2014, the Department filed a petition for termination of Father's parental rights and placement of Y.A. with Mother pursuant to § 41-3-438(3)(d), MCA, which allows a district court to place a child with a noncustodial parent. On September 24, 2014, the District Court held a hearing on the Department's petition. Mother had completed her treatment plan but Father, who again did not appear at the hearing, had neither received his treatment plan nor completed any of its requirements. Tweten testified that she attempted to mail Father a copy of his treatment plan but it was returned marked, "Could not deliver, return to sender." Tweten said that Father left her a voicemail after the January 15, 2014 hearing, indicating that he wanted to regain custody of Y.A., but did not leave his telephone number with the voicemail. Tweten testified that she attempted to contact Father three times on a phone number provided by Father's attorney. She was unable to leave a voicemail one of the times. Another time, she was able to leave a voicemail but received no response.

¶14 Y.A., who was eleven years old at the time of the hearing, had been living with Mother and R.S. on a trial home visit for more than a year. Tweten testified that, during that time, there were no reports of abuse or neglect, and Y.A. no longer had the psychological difficulties that led to her three-month placement at Shodair. Tweten further testified that Y.A. still did not want contact with Father and that it was in Y.A.'s best interests to live with Mother. According to Tweten, Father was unfit to parent Y.A. due to continued safety issues and Father's "inability to complete his [treatment plan] and

7

maintain contact with [the Department] in regards to trying to build his relationship with [Y.A.]." Resoff also testified, stating, "The Tribe feels that [Y.A.] needs to be with her mother and her grandmother." According to Resoff, the Tribe believed that Y.A. "would receive serious emotional and physical harm" if returned to Father. Laura Christofferson, the guardian ad litem and attorney for Y.A., also indicated that Father's rights should be terminated. Father's attorney indicated that Father objected to termination.

¶15 On April 29, 2015, the District Court issued its findings of fact, conclusions of law, and order granting the Department's petition to terminate Father's parental rights and place Y.A. with Mother. The District Court found that the Department made the following active efforts to safely return Y.A. to her family:

> investigation; social work counseling; mental health evaluation; placement in a residential treatment facility for [Y.A.]; home visits; placement with non-custodial parent; office visit; social work referrals and follow up; case management; mental health therapy for [Y.A.]; contact with the Sun'aq Tribe of Kodiak; and placement of [Y.A.] in mother's home on trial home visit.

The District Court concluded that terminating Father's parental rights was proper because Father had not complied with his court-approved treatment plan and "[t]he conduct rendering him unfit, unwilling, or unable to provide adequate parental care to [Y.A.] is unlikely to change within a reasonable time." The Court further concluded, "Beyond a reasonable doubt, the evidence established that the best interests of [Y.A.] will be served by termination of the parent-child legal relationship with [Father]" and placement of Y.A. with Mother. Father appeals the District Court's termination of his parental rights.

8

¶16 We review a district court's decision to terminate parental rights for abuse of discretion. *In re L.N.*, 2014 MT 187, ¶ 12, 375 Mont. 480, 329 P.3d 598. A district court abuses its discretion when it acts "arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re M.J.*, 2013 MT 60, ¶ 17, 369 Mont. 247, 296 P.3d 1197 (citation omitted). We review a district court's factual findings for clear error. *In re A.K.*, 2015 MT 116, ¶ 20, 379 Mont. 41, 347 P.3d 711 (citation omitted). A parent's right to the care and custody of a child is a fundamental liberty interest that must be protected by fundamentally fair procedures. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. However, a child's best interests take precedence over parental rights. *In re Matter of E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690.

¶17 Under § 41-3-609(1)(f), MCA, a court may terminate parental rights to a non-Indian child if it finds, by clear and convincing evidence, that "the child is an adjudicated youth in need of care," and that both "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful" and "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." ICWA imposes a heightened standard of scrutiny

on the termination of parental rights to an Indian child.[1] *In re H.T.*, 2015 MT 41, ¶ 42, 378 Mont. 206, 343 P.3d 159. Under ICWA, the court must determine "*beyond a reasonable doubt . . .* that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" before terminating parental rights. 25 U.S.C. § 1912(f) (emphasis added). In addition, a party seeking to terminate parental rights to an Indian child—in this case, the Department—"shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

¶18     Father contends that the Department did not comply with ICWA's "active efforts" requirement because the Department did not attempt to assist him with his treatment plan, provide for service providers, or initiate contact with Oregon Child Protective Services to help Father complete his plan. Although § 1912(d) does not set forth detailed criteria for determining whether the Department made active efforts, it demands that the Department do more than simply give a parent a treatment plan and wait for him to complete it. *In re J.S.*, 2014 MT 79, ¶ 25, 374 Mont. 329, 321 P.3d 103. In *J.S.*, we recognized that a "common sense" construction of the meaning of the term "active efforts" requires "that 'timely affirmative steps be taken to accomplish the goal which Congress has set: to

---

[1] On appeal, the Department argues that ICWA does not apply because Father is not Indian and, therefore, the Department's actions did not result in the breakup of the Indian family. At trial, the Department did not raise the issue whether ICWA applies, but instead argued—and introduced supporting testimony—that the Department made "active efforts" to keep the family together. We generally do not consider issues raised for the first time on appeal, and we decline to do so here. *In re J.G.*, 2004 MT 104, ¶ 27, 321 Mont. 54, 89 P.3d 11. We therefore assume ICWA applies for the purpose of deciding this case.

avoid the breakup of Indian families whenever possible by providing services designated to remedy problems which might lead to severance of the parent-child relationship.'" *J.S.*, ¶ 25 (quoting *In re G.S.*, 2002 MT 245, ¶ 36, 312 Mont. 108, 59 P.3d 1063). In determining whether the Department has made active efforts, a district court may consider "a parent's demonstrated apathy and indifference to participating in treatment," as well as "actions taken by the State to provide services for the other parent and the child." *J.S.*, ¶ 25 (citations omitted).

¶19 At trial, the Department presented evidence that it attempted to contact Father multiple times throughout its two-year involvement in the case, including several times before creating his treatment plan, using contact information provided by his attorney. The Department was unable to work with Father because Father would not communicate with the Department. By contrast, Mother did communicate with the Department, and Tweten testified that Mother had completed many of her treatment plan tasks before she entered into a formal treatment plan. As the District Court recognized, the Department presented substantial evidence that it made active efforts to return Y.A. to Mother's home, including counseling, mental health evaluations, placement at Shodair, a trial home visit, an office visit, social work referrals and follow-up, case management, mental health therapy for Y.A., and contact with the Sun'aq Tribe. Father, who was represented by counsel throughout the proceedings, has not established that these same services would not have been made available to him had he responded to any of the Department's requests for contact. Nor has he argued that his treatment plan was inappropriate, despite his failure to sign it or complete any of the tasks. The District Court did not err in finding

11

that the Department made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family.

¶20 Father also argues that the District Court abused its discretion in terminating his parental rights because, he alleges, Department involvement was no longer necessary once Y.A. was successfully placed with Mother. In deciding whether to terminate parental rights, a district court must "give primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA. One of the Department's reasons for intervening in this case was Y.A.'s fear of Father and associated psychological issues. Throughout the proceedings, the Department presented evidence that Y.A. continued to be fearful of Father and was opposed to having any contact with him. At the termination hearing, Tweten testified that it would be unsafe to return Y.A. to Father because Father had not addressed these concerns, was unwilling to complete his treatment plan, and had no contact with the Department.

¶21 The record supports the District Court's finding that, beyond a reasonable doubt, Father's continued custody of Y.A. was likely to result in serious emotional or physical damage to Y.A. and the conduct or condition rendering Father unfit to parent was unlikely to change within a reasonable time. 25 U.S.C. § 1912(f). Given Father's lack of contact with the Department despite the Department's active efforts to provide remedial services, the District Court did not abuse its discretion in determining that it was in Y.A.'s best interests to terminate Father's parental rights.

¶22 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion

12

of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court did not abuse its discretion in terminating Father's parental rights. The District Court's factual findings are supported by the record, and the court did not err in finding that the Department made active efforts to reunite Father with Y.A. We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ JIM RICE
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ MICHAEL E WHEAT