FILED

March 29 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0421

DA 15-0421

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 79N

IN THE MATTER OF:

P.V.,

     A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDN-14-048
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jennifer A. Giuttari, Law Office of Jennifer A. Giuttari, PLLC, Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

        John W. Parker, Cascade County Attorney, Valerie M. Winfield, Deputy Cascade Attorney, Great Falls, Montana

Submitted on Briefs:  February 24, 2016

Decided:  March 29, 2016

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 F.V. (Father) appeals an order of the Eighth Judicial District Court, Cascade County, terminating his parental rights to his son, P.V. We affirm.

¶3 P.V. is an Indian child under the Indian Child Welfare Act (ICWA). P.V. is affiliated with the Blackfeet Tribe of Montana. On January 16, 2014, the District Court granted Father full custody of P.V. after terminating P.V.'s biological mother's rights. On February 5, 2014, a Department of Public Health and Human Services (Department) child protection specialist (CPS) met Father at P.V.'s daycare. Father told the CPS that he was protecting P.V. from a Great Falls cult of police and probation staff. After other alarming statements, Father stated methamphetamine makes spirits more clear. Father accompanied the CPS to a pre-release center for a drug test and tested negative for all substances. Father continued to express bizarre statements to the CPS the next day.

¶4 On February 6, 2014, the Department received a report that Father had taken methamphetamine. The report also stated that other adults, under the influence of narcotics, were in the same house and taking care of P.V. On February 7, 2014, four-year-old P.V. tested positive for methamphetamine.

2

¶5 Based on Father's erratic mental stability, coupled with his admission to recent methamphetamine use, the District Court granted the Department Emergency Protective Services and Temporary Legal Custody. On March 17, 2014, Father appeared with counsel at a show cause hearing, where he stipulated to adjudicating P.V. as a youth in need of care and stipulated that the Department and the State met the ICWA standards in this matter. He also concurred with P.V.'s placement with his paternal grandmother. Because of his grandmother's health, P.V. has moved back and forth throughout these proceedings between staying with his paternal grandmother and his foster family. Due to Father's own health issues, Father was not present for his dispositional hearing on April 3, 2014, where the District Court granted the Department a six-month period of temporary legal custody and approved a treatment plan for Father.

¶6 On April 8, 2014, the State arrested Father after charging him with felony criminal endangerment of a child. The District Court found Father unfit to stand trial for mental competency reasons. Father then spent April through October 2014 either in jail or the Montana State Hospital (MSH). MSH doctors determined Father suffered from Post-Traumatic Stress Disorder and was in remission for Amphetamine Induced Psychosis.

¶7 Father met with a licensed addictions counselor before and after his time in MSH. Father also attended a relapse prevention group the counselor recommended. The Department held a group meeting with Father's relatives and the Blackfeet Tribe to discuss Father's mental health and chemical dependency, and also to determine how to

3

keep him in P.V.'s life.  MSH discharged Father in October 2014.  After his discharge, Father reengaged with his chemical dependency and mental health counselor.

¶8    After Father's October 2014 discharge from MSH, he relapsed by drinking during Christmas and again in January 2015.  Father also missed two urinalysis tests in February 2015.  After these relapses, the social worker who had been working with Father counseled him on strategies for establishing and maintaining sobriety.

¶9    On March 20, 2015, the Department filed a petition for termination of Father's parental rights.  The District Court granted the petition after a termination hearing on April 23, 2015.  During the termination hearing, the State presented six witnesses who testified, in part, about the Department's active efforts to prevent the breakup of the Indian family.  Those witnesses included Father's chemical dependency and mental health counselor, Father's parenting counselor, P.V.'s individual counselor, the State's CPS acting as this matter's caseworker, an ICWA expert, and P.V.'s foster mother.

¶10    On May 7, 2015, the District Court issued its findings of fact, conclusions of law, and order granting the Department's petition to terminate Father's parental rights and granting the Department custody of P.V.  The District Court found that the Department provided the following services to the family: (1) counseling for Father; (2) counseling for P.V.; (3) parenting classes for Father; (4) medication for Father; and (5) a treatment plan.  The District Court stated its findings of fact were "made by proof beyond a reasonable doubt."  The District Court concluded that terminating Father's parental rights was proper, in part, because "returning [P.V.] to the custody of the Birth Father would likely result in serious emotional and/or physical harm to the child."

4

¶11 We review a district court's decision to terminate parental rights for abuse of discretion. *In re K.B.*, 2013 MT 133, ¶ 18, 370 Mont. 254, 301 P.3d 836. In ICWA cases, we will uphold the district court's termination of parental rights if a reasonable fact-finder could conclude beyond a reasonable doubt that allowing the parent to continue custody would likely "result in serious emotional or physical damage to the child." *K.B.*, ¶ 18. A district court abuses its discretion when it acts "arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re M.J.*, 2013 MT 60, ¶ 17, 369 Mont. 247, 296 P.3d 1197 (citations omitted). We review a district court's factual findings for clear error. *In re A.K.*, 2015 MT 116, ¶ 20, 379 Mont. 41, 347 P.3d 711. A district court's application of law to a case's facts is a legal conclusion we review for correct interpretation of the law. *K.B.*, ¶ 18.

¶12 ICWA imposes a heightened standard of scrutiny on the termination of parental rights to an Indian child. *In re H.T.*, 2015 MT 41, ¶ 42, 378 Mont. 206, 343 P.3d 159. Under ICWA, the court must determine "beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" before terminating parental rights. 25 U.S.C. § 1912(f). A party seeking to terminate parental rights to an Indian child "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

5

¶13 Father contends the Department did not comply with ICWA's "active efforts" requirement. Specifically, Father argues that the Department did not continue its "active efforts" during his time at MSH, nor after his discharge and up until the termination hearing. He argues that the District Court, and this Court, should not consider the four years of "active efforts" he received from the Department stemming from a 2011 proceeding also involving Father and P.V.; rather, he contends we should confine our analysis only to the most recent events.[1]

¶14 Although § 1912(d) does not set forth detailed criteria to determine whether the Department made "active efforts," it requires that the Department do more than simply give a parent a treatment plan and wait for him to complete it. *In re J.S.*, 2014 MT 79, ¶ 25, 374 Mont. 329, 321 P.3d 103 (citing *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556). In *J.S.*, we recognized that a "common sense" construction of the term "active efforts" requires "that 'timely affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designated to remedy problems which might lead to severance of the parent-child relationship.'" *J.S.*, ¶ 25 (quoting *In re G.S.*, 2002 MT 245, ¶ 36, 312 Mont. 108, 59 P.3d 1063). In determining whether the Department has made active efforts, a district court may consider "a parent's demonstrated apathy and indifference to

---

[1] Father also asks this Court to analyze the Department's "active efforts" by applying the *Guidelines for State Courts and Agencies in Indian Child Custody Proceedings*, 80 Fed. Reg. 10146, promulgated in 2015. Father did not request the District Court to consider the 2015 Guidelines in rendering its decision, and we decline to consider them on appeal. Generally, this Court will not review an issue raised for the first time on appeal. *H.T.*, ¶ 14 (citing *In re D.K.D.*, 2011 MT 74, ¶ 16, 360 Mont. 76, 250 P.3d 856).

participating in treatment," as well as "actions taken by the State to provide services for the other parent and the child." *J.S.*, ¶ 25 (citations omitted). Further, "a parent's incarceration may limit the remedial and rehabilitative services that the [Department] can make available to the parent to prevent the breakup of the Indian family." *In re D.S.B.*, 2013 MT 112, ¶ 15, 370 Mont. 37, 300 P.3d 702. We do not excuse the State's obligation to make active efforts if a parent is incarcerated, but "will not fault the [Department] if its efforts are curtailed by the parent's own criminal behavior." *D.S.B.*, ¶ 15.

¶15 *D.S.B.* provides an example of what can satisfy the "active efforts" determination. In *D.S.B.*, the Department provided the father with "treatment plans, assistance of a CPS, supervised visitation, drug testing, chemical dependency treatment, counseling, referrals to treatment providers, in-home services, and parenting coaching." *D.S.B.*, ¶ 16. The Department also provided services to the Indian children at issue in the form of counseling and attempts to place them with Indian family members. *D.S.B.*, ¶ 17. We affirmed the District Court's determination that the Department satisfied its "active efforts" requirement. *D.S.B.*, ¶ 17.

¶16 Similar to *D.S.B.*, the Department in this case provided sufficient evidence to prove, beyond a reasonable doubt, that it used "active efforts" to provide services designed to prevent the breakup of the Indian family. In addition to a treatment plan, Father's counselor from Discovery Family Counseling Services testified that he "provided two separate parenting classes for [Father] over the last few years . . . help[ed] [Father] individually to apply the Circle of Security parenting concepts and just make

7

sure [Father] understood those . . . [and] provided supervised visits with [P.V.] to work on communications and interactions with him." The CPS testified to the "active efforts" Father received after his discharge from MSH. She "made referrals for [Father] to have assessments completed," and continued to work with Father after his MSH discharge. She also testified that in September 2014 she "held a meeting in our office with [Father's] family to support him, to try to keep his family involved with this child." The participants included several relatives and a Blackfeet Tribe representative who tried "to determine how to support [P.V.] being with his family." The ICWA expert testified that she believed the Department made active efforts to reunify P.V. with Father.

¶17 Active efforts in this case were also directed toward the family, not just Father. The Department repeatedly attempted to place P.V. with his paternal grandmother, while also facilitating a relationship between the grandmother and P.V.'s foster family. The Department also provided individual counseling for P.V. to help address his mental and emotional health issues.

¶18 Although the District Court did not specifically address "active efforts," the record contains sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the Department made "active efforts" to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. In light of the Department's "active efforts" and compliance with the rest of ICWA's criteria, the District Court did not abuse its discretion in determining that terminating Father's parental rights to P.V. was in P.V.'s best interests.

¶19 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court did not abuse its discretion in terminating Father's rights. The District Court's factual findings concerning the Department's efforts were not clearly erroneous, and evidence beyond a reasonable doubt supported the District Court's determination that the Department provided active, yet unsuccessful, efforts to provide remedial and rehabilitative services designed to prevent the breakup of Father and P.V. We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON